684 So.2d 508 (1996)
Linda HOERNER
v.
WESLEY-JENSEN, INCORPORATED and Pearle Vision Center, Incorporated.
No. 95-CA-0553.
Court of Appeal of Louisiana, Fourth Circuit.
November 20, 1996.
Writ Denied February 7, 1997.
*509 Marcus J. Poulliard, Seelig, Cossé, Frischhertz & Poulliard, New Orleans, for Plaintiff/Appellant, Linda Hoerner.
Terry Christovich Gay, J. Roslyn Lemmon, Christovich &Kearney, L.L.P., New Orleans, for Defendant/Appellee, Wesley-Jessen Corp.
John W. Waters, Jr., Scott A. Cannon, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, for Defendant/Appellee, Pearle Vision Center, Inc.
Before SCHOTT, C.J., and PLOTKIN, WALTZER, LANDRIEU and MURRAY, JJ.
MURRAY, Judge.
Linda Hoerner appeals the trial court's judgment maintaining defendants' exceptions of prescription and dismissing her suit for personal injuries allegedly caused by extended-wear contact lenses. We reverse.

FACTS AND PROCEEDINGS BELOW
Mrs. Hoerner's suit was filed November 20, 1989, with amended petitions filed on November 19, 1992 and April 5, 1994. The essential allegations are that she purchased extended-wear contact lenses manufactured by Wesley-Jessen Corporation[1] from Pearle Vision Center, Inc. on November 20, 1986. According to Mrs. Hoerner, the manufacturer's brochures and advertisements represented that the lenses she purchased could safely be worn continuously for at least ten days or two weeks at a time, even at night. After using the lenses in accordance with these representations for approximately six months, Mrs. Hoerner developed a severe infection, diagnosed as ulcerative keratitis, in her right eye in May 1987. Although she received immediate treatment for the infection, Mrs. Hoerner's cornea was scarred, necessitating a corneal transplant in July 1987. When questioned about the cause of the infection, Mrs. Hoerner's opthalmologist told her only that the pseudomonas bacteria cultured from her eye was "everywhere," just looking for an entrance into the body.
In November 1989, however, Mrs. Hoerner read a magazine article detailing a recently completed medical comparison of daily versus extended-wear contact lenses. Mrs. Hoerner obtained a copy of the New England Journal of Medicine, which reported that a study had concluded that the use of extended-wear contact lenses presented a significantly increased risk of severe eye infections, with the risk being incrementally related to the extent of overnight wear.[2] After reading these articles, Mrs. Hoerner, for the first time, suspected that her 1987 infection resulted from her use of the extended-wear contacts purchased in 1986. This suit was filed within weeks of her reading the People article.
Mrs. Hoerner contends that her 1987 injuries were caused by Wesley-Jessen's manufacture of a product that was unreasonably dangerous in design, and by Pearle Vision's failure to inform her that using the extended-wear contact lenses as intended significantly increased her risk of infection.
Both defendants raised exceptions of prescription.[3] Although no transcript of the *510 hearing on the exceptions is in the record, it is apparent that the matter was submitted on the pleadings and argument of counsel, supported by a copy of a September 1989 New England Journal of Medicine[4] article, as well as the depositions of Mrs. Hoerner, Dr. Richard L. Rubin and Dr. Herbert E. Kaufman, the ophthalmologists who had treated the infection and performed the corneal transplant, respectively.[5] The trial court rendered judgment in favor of the defendants, maintaining the exceptions and dismissing Mrs. Hoerner's suit with prejudice; no written reasons were assigned. This appeal followed.

DISCUSSION
A party generally must assert a delictual claim within one year from the date the injury or damage is sustained. La.Civ.Code Ann. art. 3492. If the face of the petition shows the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred. Wimberly v. Gatch, 93-2361, p. 8 (La.4/11/94), 635 So.2d 206, 211, and cases cited therein. However, such a limitation must be strictly construed against prescription and in favor of maintaining the obligation sought to be extinguished. Id.
Mrs. Hoerner asserts that the fourth category of the judicially created doctrine of contra non valentem, as set forth in Corsey v. State, Through Dept. of Corrections, 375 So.2d 1319, 1322 (La.1979) applies here: her cause of action was not known or reasonably knowable, although her ignorance was not induced by the defendants' conduct. Under this doctrine, prescription is suspended until the plaintiff knows or should know of the damage, the wrongful act and the connection between them. Branch v. Willis-Knighton Medical Center, 92-3086, p. 1 (La. 4/28/94), 636 So.2d 211, 212. As explained in Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La.1987):
Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
Thus, the one year prescriptive period does not begin to run against a plaintiff who is unaware of the facts upon which her cause of action rests unless her ignorance is willful, negligent or unreasonable. In re Howard, 573 So.2d 472, 474 (La.1991).
Mrs. Hoerner contends that she had no reason to suspect that any wrongful conduct played a part in her injury until she read of the recent medical analysis in the New England Journal of Medicine in November 1989. Since neither of her physicians suggested that her infection had been caused by her extended-wear contact lenses, Mrs. Hoerner believed that she was the unfortunate recipient of an ubiquitous germ like one who contracts measles or a cold. She asserts that it was not until she read the Journal article that she had reason to suspect that her eye had been damaged because she wore extended-wear contact lenses.
The defendants argue, however, that the standards for suspension of the prescriptive period under the doctrine of contra non, valentem are not met in this case. They contend that the causal relationship between contact lenses and ulcerative keratitis was shown to be widely known prior to 1987, not only in the medical community but throughout the general public. In this regard, the defendants argue that any distinction between contact use in general and extended-wear contact lenses is irrelevant to a sophisticated consumer such as Mrs. Hoerner. They contend that "common knowledge" of the relationship between contact lenses and *511 the risk of infection should be construed as constructive knowledge on the part of Mrs. Hoerner that her ulcerative keratitis might have been caused by her extended-wear lenses that she had worn without incident for six months. Defendants also allege that the depositions of Mrs. Hoerner's physicians establish that she would have discovered the relationship between contact lenses and eye infections if she had asked. Consequently, they argue that Mrs. Hoerner's claimed ignorance resulted from her own willfulness or neglect so that her claim should be barred since suit was not filed within one year of her corneal transplant.
As outlined below, we find that the defendants' arguments are not supported by the testimony and evidence presented at the hearing on their exceptions. Due to this lack of evidentiary support, and because a prescriptive limitation must be strictly construed in favor of maintaining Mrs. Hoerner's claim, the trial court's failure to overrule the exceptions was clearly erroneous.
We first reject the defendants' argument that the distinction between contact lens use in general and extended-wear contact lenses is irrelevant to a determination of the reasonableness of Mrs. Hoerner's inaction. This asserted distinction is an essential element of her claim against these defendants. Mrs. Hoerner does not seek redress because her infection and the subsequent damage to her cornea was caused by wearing contact lenses. Rather, she alleges that she was injured because Wesley-Jessen produced and marketed, and Pearle Vision sold without adequate warnings, a type of contact lens that, when used as intended, significantly increased her risk of infection and permanent damage to her vision. In other words, she contends that it is the "extended-wear" feature of the lenses she was sold that caused her harm. Thus, liability is asserted because the defendants allegedly modified a relatively safe product, daily-wear contact lenses, into a comparatively risky one, extended-wear lenses, without informing Mrs. Hoerner of the difference between the two. Considering these allegations, the knowledge that contact lens use in general could cause infection is not sufficient to put Mrs. Hoerner on notice that her infection and ensuing injury resulted from wearing the extended-wear contact lenses as they were designed and marketed by the defendants to be worn.[6]
We must also reject the defendants' suggestion that because Mrs. Hoerner holds a bachelor's degree in medical technology and has worked in her husband's medical office she possesses "more medical sophistication than average"[7] so that she should be held to a higher standard of knowledge than a layman.
Mrs. Hoerner testified that she received her degree in 1961 and then married Dr. Harry E. Hoerner in 1965.[8] She did the payroll and accounts payable in her husband's office and served as substitute receptionist since 1979. This is the limit of her employment for many years. There is no evidence that Mrs. Hoerner utilized any medical knowledge or skills in performing the duties she had assumed at her husband's office, nor that the degree she had earned twenty-six years earlier included any training relevant to modern medical analysis. Similarly, there is nothing to suggest that Dr. Hoerner discussed medical matters with his wife, or even that an orthopedic surgeon would possess the requisite knowledge of opthalmology that the defendants seek to impute to Mrs. Hoerner. No evidence was presented that would indicate Dr. Hoerner received periodicals or other literature relating to fields other than orthopedics. Therefore, the reasonableness of Mrs. Hoerner's failure to discover her cause of action prior to 1989 must be assessed as that of any college-educated layman.
We turn next to the defendants' assertion that Mrs. Hoerner's doctors would have put her on notice of a possible connection between her use of extended-wear lenses and the infection in her eye in 1987 if she had *512 questioned them. Our review of the physicians' depositions reveals no support for this claim. To the contrary, Dr. Rubin testified in November 1992 that he not only had no recollection of any discussion of causation, but that he probably would not have addressed this issue with Mrs. Hoerner:

Defense counsel: What would you have likely told her?....

Dr. Rubin: Well, there would be nothing that I really could have told her that specifically would have caused it because you can get a bacterial infection or a corneal ulcer from anything. It could be caused from trauma to the cornea or rubbing of the eye. It could be caused from contact lenses. It could be caused from a lot of things, but there was nothing that I could or would be able to ascertain that would be a direct cause.

Defense counsel: Would you have laid out the possible causes of her infection?

Dr. Rubin: No, because during that period of timebright people can manifest significant stress and Linda during that period of time was very much stressed, and I'm sure that even if I would have had a detailed conversation with her she would not have really been listening to me.
* * * * * *

Defense counsel: Now did there ever come a time when either Mrs. Hoerner or her husband asked you or you would have told them in the course of some conversation that there may have been a connection between her extended-wear contact lenses and her infection, either that they caused it or they contributed to it or somehow had some connection to it?

Dr. Rubin: I can't think of a specific instance when I would have said that. It's possible that I could have indicated that contact lenses were among the possibilities, but I can't even be certain that I said that.

Defense counsel: You don't recall any specific conversations with the Hoerners during this period of time of the infection about what may have caused it?

Dr. Rubin: During that period of time most of our attention was directed towards the gravity of the infection.
* * * * * *

Defense counsel: Would you relate Miss [sic] Hoerner's infection to wearing extended-wear lenses?

Dr. Rubin: At this point [1992] I probably would.

Defense counsel: What about in '87?

Dr. Rubin: I probably would have had some strong feelings about it at that time, but I don't remember really saying that to her. Again she was a very concerned individual and, too, I don't really like to find blame in an incident. I usually like to attack the incident.

Defense counsel: I understand that but let me ask you this.... At some point would you have told her that contact lenses werethat there was an increased risk of infection from contact lenses?

Dr. Rubin: I can't recall specifically whether I went that far or not.

Defense counsel: Are you saying that you would not have told her?

Dr. Rubin: I don't thinkin a situation like that I might have avoided discussing it while her problem was still active only to think that maybe I would defer discussing that with her until the time that she would either contemplate going back for contact lens wear again or that she was less emotional about her condition. The chances are likely that even if I thought it at the time I might not have wanted to discuss it with her while her condition was active.
[Emphasis added.]
Dr. Rubin last treated Mrs. Hoerner on June 15, 1987, when he referred her to Dr. Kaufman for the corneal transplant; she subsequently obtained all treatment and corrective lenses through the latter physician. There is nothing in Dr. Rubin's testimony to establish either that he told Mrs. Hoerner of a possible connection between the corneal infection and her use of extended-wear contact lenses, or that he would have told her that a connection was possible, if she had asked.
*513 When deposed in June 1992, Dr. Kaufman, like Dr. Rubin, was unable to recall discussing causation with Mrs. Hoerner. However, he did not find her failure to inquire unusual because "[m]any people who have an infection realize that a bacteria causes the infection. They don't go a step further to say why did the bacteria just like when you get a cold, many people don't asksome do and some don't, what caused that. If it is an infection, it's caused by a germ." [Emphasis added.]
Throughout his deposition, Dr. Kaufman generally drew no distinction between daily and extended-wear contact lenses as a source of corneal infections. However, he was twice questioned regarding Mrs. Hoerner's lenses:

Defense counsel: How often should a person wear soft contact lenses like Mrs. Hoerner was wearing before her corneal abrasion? How long should she take them out? [Sic]

Dr. Kaufman: Well, it's an impossible question to answer. The data indicates that if you take a contact lens out every day and clean it, you have less risk of infection than if you leave it in even for a week and take it out. The longer you leave it in without taking it out and cleaning it, the higher the risk....
* * * * * *

Plaintiff's counsel: Early on ..., it seemed as though you may have been talking about contact lenses in general. So my question is, just to clear the record, are there risks peculiar with [sic] the wearing of extended-wear or soft contact lenses? Dr. Kaufman: Yes. The extended wear lenses represent a higher risk of infection than ordinary lenses. A Boston study provides a nice illustration.

Plaintiff's counsel: And has the magnitude of the increased risk of the wearing of soft contact lenses always been of common knowledge?

Dr. Kaufman: Always, and it has always been of knowledge that in someone with dry eyes and exposure, that risk is even higher. That should be common knowledge to anybody.

Plaintiff's counsel: Okay.

Dr. Kaufman: Anybody who will dispense contact lenses.
At most, Dr. Kaufman's testimony suggests that those who dispensed contact lenses should have been generally aware by 1987 of the risk that infection could result from extended-wear contact lenses. It is significant, however, that Dr. Kaufman refers to "[a] Boston study" as illustrating the higher risk of infection associated with extended-wear contact lens because he previously had identified the 1989 Journal article in evidence here as "the article from Boston." When taken together, these references suggest that, in fact, even Dr. Kaufman recognized 1989, rather than 1987 or earlier, as the point at which the hazards of extended-wear lenses became evident.
Further support for this view is provided by the Journal article itself, which states:
Although both medical publications and the popular press have discussed the risks of corneal ulceration infection in those who use soft contact lenses, estimates of the relative risk of using daily-wear as compared with extended-wear lenses have been speculative, and proposed risk factors have been based on uncontrolled studies. Institutional case series have described the spectrum of disease and its associated microbiologic processes. However, with the exception of a case-control study devoted exclusively to acanthamoeba infections, there have been no controlled investigations.
Journal article, supra note 4, at 773 (emphasis added) (footnotes omitted). In addition, attached to this article is a May 1989 notice from the Food and Drug Administration stating that, based on the reported study, the recommended wearing time for extended-wear contact lenses should be reduced and warnings strengthened. This documentary evidence, not published until 1989, negates Dr. Kaufman's vague assertions that the risks of extended-wear lenses were "always common knowledge" to eye care professionals. Therefore, the depositions do not support the defendants' claim that Mrs. Hoerner could have discovered their alleged wrongful conduct by asking either of her physicians in 1987.
*514 The evidence presented indicates that Mrs. Hoerner's situation is similar to that of the plaintiffs in Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La.App. 1st Cir.1992), who alleged that the use of adult aspirin to treat a child's flu-like symptoms had resulted in her permanent brain damage from Reye's Syndrome. Although the child's illness occurred in October 1981, suit against the manufacturer and seller of the aspirin was not filed until September 1987. Nevertheless, the court found that the claim had not prescribed because until hearing a radio talk show in April 1987, the child's guardians simply believed she had contracted a devastating illness "like polio," since the doctors all said the cause of Reye's Syndrome was unknown. Although magazine and newspaper articles concerning a possible link between aspirin and Reye's Syndrome had been collected, this was found insufficient to establish that the plaintiffs had constructive notice that the defendants' wrongful conduct may have been related to the child's permanent injuries.
Viewed in this light, it can be seen that although Mrs. Hoerner knew she had suffered an injury and resultant permanent damage in July 1987, her reasonable inquiry as to the cause of her infection and injury resulted in her being told only that the harm had been caused by a particular bacteria present throughout the environment. Even had she inquired further, it was unlikely that Mrs. Hoerner would have been told in 1987 that extended-wear contact lenses significantly increased the likelihood of eye infections. It was only in 1989 that the medical community recognized the increased risk associated with extended-wear contact lenses. Not until Mrs. Hoerner read in the popular press in 1989 that users of extended-wear contact lenses were more likely to contract eye infections than those using daily-wear lenses did she suspect that she had been injured by another's conduct, rather than by a "bug" to which anyone could have been exposed. Once thus put on notice, she obtained the Journal article in order to further explore the matter. She filed suit shortly after she discovered that her use of this product as it was designed and marketed to be used might have caused her injury.
As previously noted, a prescriptive period does not begin to run until a claimant has knowledge of the damage, the wrongful act and the connection between them. Branch v. Willis-Knighton Medical Center, 92-3086 at p. ___, 636 So.2d at 212. The evidence presented in this case does not establish that Mrs. Hoerner either knew or should have known more than one year before her suit was filed that her injury could be related to the defendants' allegedly wrongful conduct. Because the trial court's ruling is thus unsupported by the evidence, the judgment below is reversed, and the defendants' exceptions of prescription are overruled. Each party is to bear their own costs of appeal.

REVERSED.
SCHOTT, Chief Judge, dissenting.
On the face of the pleadings plaintiff's suit was prescribed. She had the burden of proving that prescription did not run in her case because her cause of action was not "reasonably knowable" under the circumstances of this case.
Plaintiff was an experienced medical technologist who had been married to an orthopedic surgeon for 30 years and had worked in his office for ten years. The medical literature had reported a relationship between contact lens and eye infections for many years prior to plaintiff's problem. When her eye became irritated at lunch she immediately removed the contacts, rinsed them, and replaced them. When she returned home she again removed them never to replace them again. Dr. Rubin, her treating physician indicated that he would have told her about the importance of keeping contact lenses clean had she not been a very bright person married to a physician and often around doctors socially and professionally. Dr. Kaufman who performed the surgery on plaintiff was more direct in stating that it was common knowledge that wearing contact lenses carried the risk of corneal infection. "Anybody would know that," he said.
In determining whether plaintiff's problem was reasonably knowable the question is whether there was notice enough to excite plaintiff's attention and put her on guard to prompt further inquiry. Mistich v. Cordis, *515 607 So.2d 955 (La.App. 4th Cir.1992). I respectfully submit that the facts summarized above clearly establish that plaintiff had sufficient notice to put her on guard that the contact lenses might be the cause of her problem. Her problem was reasonably knowable under the circumstances.
The trial court is the fact finder and in that capacity decided that plaintiff failed to carry her burden of proof with her testimony, that she had no reason to suspect a relationship between the contact lenses and the infection until 1989 when she read an article about it. The trial court judged her credibility and made findings and conclusions of fact which should be respected on appeal.
I would affirm the judgment.
WALTZER, J., dissenting with reasons.
WALTZER, Judge, dissenting with reasons.
Finding no error below, I respectfully dissent from the majority's reversal.
I agree with the Chief Judge that Ms. Hoerner's petition is prescribed on its face, and that she bears the burden of proving that prescription did not run in her case because her cause of action was not "reasonably knowable" under the circumstances of the case. Indeed, in light of this medically sophisticated plaintiff's background, it is clear that she knew or should have known of a relationship between the presence of ANY foreign object in her eye and her unfortunate subsequent infection. The casuistry evident in the majority's enunciation of the niceties of the distinction between regular contact lenses and extended wear lenses is wholly irrelevant in the context of this particular plaintiff's claim of ignorance.
The trial court had the benefit of the following evidence:

LINDA HOERNER'S DEPOSITION
Plaintiff testified that she was born in 1939, has been married to an orthopedic specialist since 1965 and has three sons, all in their twenties. She holds a Bachelor of Science degree from Loyola with a Medical Technology major. She has not worked for a salary for over 10 years, and works without pay in her husband's office as an accountant and substitute receptionist. Her medical history consisted of an eye and face lift and breast implants in 1985 and a hysterectomy in 1970 or 71. She began to wear glasses at age 40, strictly for reading. She and her husband bought contact lenses from Pearle at the same time on 20 November 1986he wears glasses almost all the time, and she, having seen an advertisement for colored contact lenses inquired about the lenses because, "Yeah, I wanted blue eyes." They were not designed to enhance her vision, but she testified "I think they had a slight prescription in them, yeah .... for magnification." She testified that she had tried contact lenses years before, but felt it wasn't worth the trouble, "but now that I wanted blue eyes it was worth the trouble." When asked what she thought she was buying, she replied, "It was to color my eyes, to get rid of my brown eyes, and they were pretty." Her son Bobby also wears soft contact lenses, and she thought these would be more comfortable than the hard lenses she had tried previously. She had no specific recollection of her conversation with the salesman when she ordered the lenses or when she picked them up, although she recalled that someone demonstrated how to insert them. She was told to read the directions and clean the lenses properly. She does not recall if instructions came in a pamphlet with the lenses; however, she recalls reading inserts that came with the cleaning products. She denied that anyone explained the hazards involved if she did not follow the cleaning instructions, and denied any mention of any kind of eye irritation. She recalled that she was told she could keep the lenses in for a week to ten days. She testified that she never thought of any hazards at all because her son wore contact lenses. She admitted that hygiene prevents problems, generally. She worked up to being able to wear the lenses for the maximum recommended time, which she thought was seven to ten days. Her husband did not tolerate the lenses as well, so he removed his every night.
The only problem she had with the lenses before her corneal infection was immediate difficulty with night vision. She testified that she wore the lenses for "whatever the *516 prescribed time was", cleaned them overnight, and reinserted them the next morning, "if I was going somewhere....If I needed blue eyes, yeah. They were like make-up to me." She would take them out and not reinsert them until she "needed blue eyes."
In May, 1987, at a luncheon, both eyes felt very irritated. On previous occasions, minor irritation was handled by putting a "drop of saline in or something because they were dry." By the time she got home, she was "pretty miserable," although she had taken the lenses out in the lady's room, rinsed them and put them back in. Her eyes were red and teary. Her right eye became painful and her left eye cleared up. She stayed home in a dark room the next day and took "something my husband gave me" for pain. The pain worsened and she went to see Dr. Rubin the next day. She never went back to Pearle to ask about the contact lenses. Dr. Rubin tested her eye for infection and gave her two topical antibiotics, and told her he thought the eye was infected and bandaged her eye. She told him about the incident at the luncheon. A day or so later, she returned to Dr. Rubin, who told her she had a serious infection, pseudomonas, and re-bandaged her eye. He told her he knew of young people who lost vision overnight because of this bacteria, but did not tell her how she became infected. Because of residual scar tissue on the cornea, Dr. Rubin referred plaintiff to Dr. Kaufmann, and surgery was performed in July. She testified:
Q: Did [Dr. Rubin] ever discuss with you the possible association of extended wear soft contact lenses and the contraction or the infection by this bacteria?
A: I don't remember that.
Q: But it's possible?
A: Is what possible?
Q: Is it possible that at that discussion, that he did discuss that with you.
A: I don't remember that. I don't remember theI don't remember that at all, that discussion.
She gave Dr. Kaufman the same history she had given to Dr. Rubin; she did not recall if he asked whether or not she wore contact lenses; she testified, "I would think I probably did tell him." She did not remember if Dr. Kaufman told her use of extended wear soft contact lenses would make her more susceptible to contracting the bacteria. She had corneal transplant surgery, following which, while she was still in the hospital, the Pearle salesman who had sold her the lenses called to see how she was doing. She testified "I told him I appreciated the call, and afterward, I thought, does he think I'm going to sue him, because that was never in my mind."
She testified that the first time she developed the idea that there might be a relationship between the extended wear lenses and infection was when she read her subscription copy of People Magazine, 6 November 1989 edition. She told her husband about the article, who spoke with a physician friend of his who referred to an article in the New England Journal of Medicine (September 1989) which plaintiff read.

DR. HERBERT E. KAUFMAN'S DEPOSITION
Dr. Kaufman did not recall plaintiff's having been curious about the source of her infection. He testified:
Q: You said it is common knowledge that the wearing of contact lenses and infections sometimes go together.
A: Yes, that's correct.
Q: Was this common knowledge in 1987 when it happened?
A: Oh, yes.
Q: How long had that been common knowledge?
A: Oh, forever. I mean, it's always been known that the wearing of contact lenses represent this hazard.... Although our knowledge about the exact magnitude of the risk has improved lately, it has always been known that this is the case.
* * * * * *
Q: [Would] a layman on the street [know that]?
A: I don't know. I would think that anyone to whom contact lenses were dispensed would be told that an infection is a risk, in part, because they have to clean lenses and *517 take care of them, and that's a primary reason.
He also testified that the problem was well known before publication of the 19 September 1989 article in the New England Journal of Medicine. He also testified that the risk was mentioned in insert warnings on the cleaning products used with contact lenses. Contact lenses are the most prevalent way to contaminate the eye, and the contact lens not only serves as a vehicle to bring the bacteria into the eye, but also as a vehicle to damage the surface so that the bacteria can get a foothold. He testified that plaintiff was "reasonably well informed" but did not know if she was informed about this particular risk. He testified that "We would tell anyone that there are risks of damage to the eye (from contact lenses) and that they have got to take care of their lenses," but could not recall specifically if he had told this to plaintiff. It was, however, his usual practice to tell her something to that effect, he tells all his patients about this risk, and plaintiff was no exception.
Mrs. Hoerner, according to Dr. Kaufman, had two predisposing factors to the infection: she had had plastic surgery which left her with eyes that did not completely close and would dry out; this predisposed to drying and abrasion. The contact lenses also predisposed her to dryness and abrasion.

DR. RUBIN'S DEPOSITION
Dr. Rubin testified that he examined plaintiff and gave her a prescription for contact lenses, but did not dispense the lenses himself. He testified that "It has always been the feeling of eye physicians that bad hygiene associated with contact lens wear could be associated with eye infections." All patients, even as early as 1980 when he prescribed plaintiff's first contact lenses, would be told of the need for good hygiene. He said he would have so advised plaintiff, but would not have overemphasized this to her since she had been around doctors professionally for some time.

ANALYSIS
Although there were no written reasons for judgment, the trial judge apparently believed that when the infection was diagnosed, plaintiff knew or reasonably should have known that it could have been caused through the extended wear contact lenses. See Mistich v. Cordis Mfg. Co., 607 So.2d 955 (La.App. 4 Cir.1992). In that case, plaintiff's claim of a faulty pacemaker was held to have prescribed. In September 1980, the pacemaker was implanted into an 11-year-old child and the family was told it would last her lifetime. Three years later, it was determined the batteries had run down and they were replaced. Five years after that, the child's mother read that the pacemaker manufacturer had sold defective corrosion-prone batteries between 1980 and 1985. This Court held that when plaintiff's family learned the pacemaker had to be replaced in just 3 years after having been told it would last a lifetime, they had constructive notice or knowledge of its defect and prescription began to run. The Court also rejected a fraud claim, irrelevant to the instant case.
It is unreasonable to conclude that Dr. Kaufman did not tell plaintiff in July, 1987, when he saw her preparatory to the corneal transplant, of the connection between contact lens use and infection of the type she had suffered. Such a lapse would have been contrary to the customary practice to which he testified. The trial judge probably felt that Kaufman's testimony concerning his procedure, coupled with his testimony that the connection between contact lens use and the risk of infection was noted in the package inserts accompanying the cleaning materials that plaintiff said she read and used, demonstrated reasonable constructive notice (at least) that the infection could be connected to contact lens use.
The doctor's testimony and the package inserts, which plaintiff admits having read, distinguishes the instant case from Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La. App. 1 Cir.1992). In that case, there was nothing to indicate any possible connection between aspirin and Reyes syndrome prior to publicity generated within the one year prescriptive period.
The standard of review of a trial court's finding of facts supporting prescription is "that the appellate court should not disturb the finding of the trial court unless it is *518 clearly wrong. This court should determine whether the district court judgment is clearly wrong considering all the evidence, Canter v. Koehring Company, 283 So.2d 716 (La.1973) and it's [sic] progeny." Pelt v. Guardsmark, Inc., 451 So.2d 621 (La.App. 5 Cir.1984).
Since this issue is a factual determination made by the trial judge, i.e., notice for the purpose of the running of prescription, our review of the record is limited by the "manifest error" standard of review, as set out in Canter v. Koehring Company, 283 So.2d 716 (La.1973), and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Under the authority of these cases, this court is constrained to give great weight to the trier of fact's determinations on the evidence presented and we are prohibited from substituting our own evaluations and determinations for those made by the trial court. Plaquemines Parish Com'n v. Delta Development Co., Inc., 486 So.2d 129, 138, reversed on other grounds, 502 So.2d 1034 (La.1987).
The Supreme Court's opinion in Delta Development relied on its finding that the lower courts were clearly wrong in failing to find contra non valentem applicable where there was evidence that the Perezes used fraud and concealment and abuse of fiduciary duty to prevent plaintiffs from obtaining knowledge of their cause of action, but did not reverse this Court's statement on standard of review (manifest error).
Clearly, the trial court's underlying factual findings in the instant case, i.e. that Mrs. Hoerner knew there could be a connection between infection and contact lensesof whatever kindby reason of her medical background and her admitted familiarity with the instructions that accompanied the lens cleaners she used, are to be reviewed under the manifest error standard. A de novo review such as the majority has performed, while appropriate in the context of a summary judgment and an exception of no cause of action, See Security Center Protection Services, Inc. v. All-Pro Security, Inc., 94-1317 (La.App. 4 Cir. 2/23/95), 650 So.2d 1206, 1211, is not appropriate, I believe, for the exception of prescription.
I find that the record supports the trial court's judgment, and would affirm.
NOTES
[1] Originally named as Wesley-Jenson, Inc. in error.
[2] Although the petition refers to a September 1989 New England Journal of Medicine report as providing notice of Mrs. Hoerner's claim, her deposition makes clear that she first read a summary of that article in the November 1989 issue of People magazine, then obtained a copy of the earlier medical journal.
[3] Pearle Vision's exception of prescription was originally overruled by judgment dated March 18, 1991. However, the exception was reurged in a subsequent answer filed March 10, 1992, and again in a separate pleading filed November 3, 1994. The latter exception came after Wesley-Jessen had been served with the suit in April 1994 and responded with its exception in its June 1994 answer and in a separate exception filed October 10, 1994.
[4] Oliver D. Schein et al., The Relative Risk of Ulcerative Keratitis Among Users of Daily-Wear and Extended-Wear Soft Contact Lenses, 321 New England J.Med. 773 (1989) [hereinafter Journal article].
[5] We find nothing in the record to indicate that a deposition of a Dr. Boudreaux was submitted, as referenced in Pearle Vision's brief.
[6] We therefore pretermit discussion of the evidence submitted regarding public knowledge in 1987 of a causal relationship between contact lenses and ulcerative keratitis.
[7] Pearle Vision's brief at page 5.
[8] Dr. Hoerner is now an orthopedic surgeon.