MICHAEL E. KIRBY, Judge.
| ¶ Defendant, American Sugar Refining, Inc. (f/k/a Domino Sugar Corporation, f/k/a Tate & Lyle North American Sugars, Inc., f/k/a Amstar Corporation, f/k/a Amstar Sugar Corporation), appeals the trial court judgment in favor of plaintiffs, Leico Anthony Assevedo, John Hayward, Jack Oal-mann, Tommy Smith and Edgar Wood-ridge. For reasons that follow, we affirm.
Plaintiffs, all former long-time employees of the defendant, filed suit against the defendant for damages for hearing loss allegedly caused by long-term exposure to hazardous industrial noise at the defendant’s facility in Arabi, Louisiana. The length of time these plaintiffs worked for the defendant ranged from twenty (20) to thirty-eight (38) years. The plaintiffs in whose favor judgment was rendered represent the “first flight” of a larger group of plaintiffs with similar claims. Following a nine-day trial, the trial court found the defendant liable to each of the five plaintiffs, and awarded damages for hearing loss.
On appeal, the defendant has alleged five assignments of error:
(1) the district court committed legal error by charging Domino with the burden of disproving contra non \9valentem, and ruling that the plaintiffs’ claims are not prescribed,
(2) the district court’s conclusion that Domino is liable to the plaintiffs in negligence and strict liability cannot be reconciled with either the record evidence regarding breach of duty or causation, or the district court’s other findings of fact regarding prescription,
(8) the district court committed legal error by failing to apply any standard, much less the proper standard, to the plaintiffs’ strict liability claims,
(4) the district court committed legal error by holding that the plaintiffs’ claims for occupational hearing loss are not barred by the exclusivity provision of the Louisiana Worker’s Compensation Act, and
(5) the district court committed legal error by limiting the testimony of plaintiff Edgar Woodridge, and excluding testimony that is highly relevant to prescription and should have been admitted into evidence.
Taking the fourth assignment of error first, i.e. that plaintiffs’ claims for long-term occupational hearing loss are barred by the exclusivity provision of the Louisiana Worker’s Compensation Act (“LWCA”), we note that this Court addressed this same issue in its recent decision of Becker v. Murphy Oil Corp., 2010-1519 (La.App. 4 Cir. 6/2/11), 70 So.3d 885. As in the instant case, the Becker case also involved former employees suing their former employer for damages for hearing loss allegedly caused not by a single traumatic event, but by long-term occupational noise exposure. In ruling that the plaintiffs’ claims against their former employer were not barred by the exclusivity provision of the LWCA, the Becker court stated:
*78 [w]e conclude that gradual hearing loss resulting from occupational noise exposure over a period of many years simply cannot meet the definition of an ‘accident’ under |sany version of the LWCA. Likewise, the trial court did not err in finding that Mr. Barcia’s claims are not a basis for recovery under the LWCA as an occupational disease.
Subsequent to this Court’s rendition of the Becker opinion, Murphy Oil applied for writs with the Louisiana Supreme Court. On November 23, 2011, the Louisiana Supreme Court denied writs. Becker v. Murphy Oil Corporation, 2011-1750 (La.11/23/11), 76 So.3d 1154. Thus, the Becker decision of this Court is now final and definitive. La. C.C.P. Article 2166 E. Following the holding in Becker v. Murphy Oil Corporation, 2010-1519 (La.App. 4 Cir. 6/2/11), 70 So.3d 885, we hold that plaintiffs’ claims in the instant case of damages for hearing loss caused by long-term occupational noise exposure are not barred by the exclusivity provision of the LWCA. This assignment of error is without merit.
On the issue of prescription, the defendant first contends that the standard of appellate review should be de novo in this case, rather than the usual manifest error/clearly wrong standard. According to the defendant, the trial court committed legal error by charging it with the burden of disproving that the doctrine of contra non valentem applied in this case. Plaintiffs respond that the trial court correctly charged plaintiffs with the burden of proving the applicability of the contra non va-lentem doctrine, and therefore, the manifest error/clearly wrong standard of review applies.
The law regarding the burden of proof on the issue of prescription was summarized by this Court in Grant v. Tulane University, 2002-0848, p. 3 (La.App. 4 Cir. 4/23/03), 853 So.2d 651, 652-653, as follows:
|4A party generally must assert a del-ictual claim within one year from the date the injury or damage is sustained. La. C.C. art. 3492. Hoerner v. Wesley-Jensen, 95-0553, p. 3 (La.App. 4 Cir. 11/20/96), 684 So.2d 508, 510. When it is not obvious from the face of the petition that the claim is prescribed, the burden rests on the defendant or party pleading prescription. Stett v. Greve, 35,140, pp. 7-8 (La.App. 2 Cir. 2/27/02), 810 So.2d 1203, 1208. However, if the face of the petition shows that the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred. Lima v. Schmidt, 595 So.2d 624 (La.1992).
Under the judicially created doctrine of contra non valentem, prescription is suspended (1) when there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiffs action; (2) when there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of this cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Landry v. Blaise, 2002-0822 (La.App. 4 Cir. 10/23/02), 829 So.2d 661, citing Corsey v. State of Louisiana, Through the Department of Corrections, 375 So.2d 1319, 1321-22 (La.1979).
In this case, the trial court found that the fourth prong of the contra non valentem doctrine applied, i.e. that the plaintiffs did not know or could not reasonably know of their cause of action against the defendant until less than one year *79 from the time each filed suit against the defendant. A reading of the reasons for judgment as a whole shows that the trial court properly charged the plaintiffs with the burden of proving that the doctrine of contra non valentem applied to suspend the running the prescription. The defendant has singled out one sentence in the reasons for judgment in support of its claim that the trial court improperly charged the defendant with the burden of disproving the applicability of contra non | ¿valentem. The sentence in question is: “Defendants seek to show the Plaintiffs had constructive knowledge of their hearing loss and its cause.”
We find no merit in the defendant’s argument that this statement shows the trial court improperly charged it with the burden of disproving contra non valentem. Rather, this statement in the trial court’s reasons merely describes efforts made by the defendant to rebut evidence offered by plaintiffs to show that contra non valen-tem operated to suspend the running of prescription. Because we find no error of law committed by the trial court on the issue of burden of proof regarding the applicability of the contra non valentem doctrine, the trial court’s ruling on this issue is not subject to a de novo review.
The standard of review on the issue of prescription was recently summarized by this Court in Chef Menteur Land Company, Ltd. v. Sandrock, 2011-0497, p. 2 (La.App. 4 Cir. 10/19/11), 78 So.3d 146, as follows:
“[T]he trial court’s findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review.” London Towne Condo. Homeowner's Ass’n v. London Towne Co., 2006-401, p. 4 (La.10/17/06), 939 So.2d 1227, 1231 (citing Carter v. Haygood, 04-0646 (La.1/19/05), 892 So.2d 1261, 1267). Pursuant to this standard, “a factual finding cannot be set aside unless the appellate courts [sic] finds that it is manifestly erroneous or clearly wrong.” London Towne Condo. Homeowner’s Ass’n, p. 4, 939 So.2d at 1231 (citing Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989)). Appellate courts should not re-weigh the evidence or substitute its own factual findings. Id.; Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 278-79. Likewise, “[w]here there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.” Id.
| (¡Because the trial court reached the issue of the applicability of contra non valentem, he obviously found that plaintiffs’ claims are prescribed on the faces of their respective petitions. We agree. In reviewing the trial court’s ruling that the doctrine of contra non valentem operated to suspend the running of prescription as to the five plaintiffs in this case, we have examined the evidence offered on this issue, and present the following summary.

Leico Assevedo

Leico Assevedo worked for the defendant for nineteen (19) years, from 1976 to 1995. He had a fourth (4th) grade education. When Mr. Assevedo began his employment with the defendant, his hearing was tested and determined to be “good” or “perfect.” For the first ten (10) years of Mr. Assevedo’s employment, there were no signs at the plant recommending hearing protection for the workers. In 1986, Mr. Assevedo’s hearing was tested again, and he was told that he had a hearing loss and needed to wear earplugs to protect him *80 from further hearing loss, which would be permanent. He was never told to wear muffs over the earplugs. Mr. Assevedo testified that, while employed by the defendant, he attributed his hearing problems to the aging process, and not to his work experience.
Mr. Assevedo testified that he had ringing in his ears while at work, but the ringing went away when he was at home. Therefore, he assumed the problem of the ringing in his ears was only temporary. When asked at trial if he thought his hearing problems were related to his work while he was still employed by the defendant, his response was, “I might have thought that at the time. I don’t recall. But I thought it was, yeah.” But he insisted that no one at work ever told him that noise in the workplace was a possible cause of his hearing loss. Defendant’s 17attempts to impeach Mr. Assevedo’s credibility with his earlier deposition testimony were complicated by Mr. Assevedo’s limited ability to read due to the fact that he did not receive formal education past the fourth (4th) grade.
Mr. Assevedo alleges that he was first notified that he had noise-induced hearing loss on July 18, 2005, by letter from Dr. Phillip L. Wilson, an audiologist retained by one of the law firms representing him in this matter. Dr. Wilson stated in the letter that he reviewed audiometric data relating to Mr. Assevedo, and determined that he had “a moderate high frequency hearing impairment consistent with noise-induced hearing loss.” Mr. Assevedo filed his lawsuit against defendant on March 15, 2006.

John Hayward

John Hayward worked for the defendant for thirty (30) years, from 1972 to 2002. An audiogram performed approximately four (4) years into his employment showed no problems with his hearing. In the 1980’s, Mr. Hayward began noticing warning signs regarding noise at his workplace. These signs also indicated that employees were required to wear hearing protection. He was issued a muff to wear at work in 1984. A document signed by Mr. Hayward in December 1996, and offered into evidence by defendant is entitled, “Audom-etric [sic] History and Examination.” In this two-page document, sections were checked indicating that the employee had a hearing loss and never wore hearing protection. At trial, Mr. Hayward acknowledged signing this document, but denied providing such information or filling in these notations on the form, which he claimed were not true. A review of this document shows that the handwriting on the document, other than the signature of Mr. Hayward, appears to be that of the signature nurse.
|8In January 1997, Mr. Hayward received a “Notice of Hearing Shift” from industrial audiologist Dr. Clifton Istre, who was retained by the defendant. In that notice, Mr. Hayward was advised to “[w]ear ear protectors at your place of work to prevent further hearing change.” Several other audiograms were performed on Mr. Hayward in 1998. He signed documents relating to these, but testified at trial that he did not provide some of the information that appears on these forms and denied their accuracy. An audiogram, conducted in October 2000, showed that Mr. Hayward had a moderate hearing loss for high-pitched sounds. Mr. Hayward acknowledged that he was told of this hearing loss, but testified that he did not at that time associate the hearing loss with his employment. He said he “just thought it was life and age at that time.”
Mr. Hayward received a letter, dated July 18, 2005, from Dr. Wilson advising him that audiometric data supplied by one of the law firms representing Mr. Hay *81 ward indicated that he had “a moderate high frequency hearing impairment consistent with noise-induced hearing loss.” Mr. Hayward filed suit against the defendant on March 15, 2006.

Jack Oalmann

Jack Oalmann worked for the defendant for thirty (30) years, from 1971 to 2001. He had an eighth (8th) grade education, and was sixty-seven (67) years old at the time of trial. He was tested for hearing loss in 1976, and his signature appears at the bottom of a form indicating the results of that test. On this form, a section is checked indicating that Mr. Oalmann was exposed to noise in previous jobs for fifteen (15) years. At trial, Mr. Oalmann denied checking that section or providing that information, which he claims is false. Mr. Oalmann’s signature appears at the bottom of a listing of the numerical results of a hearing test, conducted in 1985, but 1 flthis form did not offer an explanation of the results. Mr. Oalmann testified that he did not understand the test results and no one explained the results to him. He testified that the first time he was offered hearing protection while working for the defendant was in the late 1980’s or early 1990’s. He testified that he regularly wore hearing protection while at work from the time his employer offered it until he retired.
According to the defendant, Mr. Oal-mann was sent a “Notice of Hearing Shift” from Dr. Istre dated December 26, 1991. On this notice, Mr. Oalmann was instructed to “[w]ear ear protectors at your place of work to prevent further hearing change,” and to “[r]etest and forward results.” Mr. Oalmann testified that he never received the December 26, 1991 notice. Additional hearing examinations were performed in 1996 and 1997, and the forms signed by Mr. Oalmann indicated a history of hearing loss and exposure to noise at previous jobs. Mr. Oalmann acknowledged signing the forms beneath the statement, “I have been counselled and made aware of the results of my hearing examination,” but claims other parts of the forms include numerous errors and misinformation that he did not provide and to which he did not agree. He gave similar testimony about other forms signed by him following hearing examinations conducted during his employment with defendant.
At trial, Mr. Oalmann was presented with his earlier deposition testimony in which he stated that another employee of the defendant, Mr. Geoff Willard, who is described as the “refinery nurse,” advised him that he had hearing loss in 1999. Mr. Oalmann stated in his trial testimony that he did not recall that conversation. In any event, he insisted that no one employed by the defendant ever told him that noise in the workplace was causing him to suffer hearing loss. When he had a | shearing test performed in the office of a physician for whom his wife worked in 2005, the results showed hearing loss, but Mr. Oal-mann attributed that to the aging process. The physician did not discuss the results with Dr. Oalmann. After that test, he was examined by a physician, Dr. Ross Roeser, who was referred to him by his attorney. He testified that his first knowledge that the noise at his place of employment with the defendant caused his hearing loss was during his visit with Dr. Roeser. Mr. Oal-mann filed his lawsuit against defendant on January 17, 2006.

Tommy Smith

Tommy Smith worked for the defendant for twenty-three (23) years, from 1976 to 1999. Mr. Smith passed away prior to trial, so his pre-trial deposition was introduced into evidence. He testified that he dropped out of school in the eighth (8th) grade. He voluntarily started wearing earplugs at work in 1977, stating that he *82 did so because the noise bothered him. He said no one employed by the defendant ever told him to wear hearing protection. He recalled having only two (2) hearing tests at work. The second test was in 1995, and Mr. Smith was told afterward by Geoff Willard that he should have further testing because he had some hearing loss. He stated that at that time, he did not make a connection between the noise at work and his hearing loss. Rather, he attributed the hearing loss to the aging process.
In 2008, four (4) years after Mr. Smith retired from his employment with defendant, he noticed his hearing worsening, but did not seek medical attention at that time and did not relate the hearing loss to noise at his former employment. Mr. Smith testified that his first knowledge that his hearing loss was related to noise exposure at work was when he went for testing with an audiologist recommended to him by his lawyer. Dr. Phillip Wilson sent Mr. Smith a letter | ndated February 14, 2005, stating that his review of testing performed on Mr. Smith showed a severe high frequency hearing impairment consistent with noise-induced hearing loss. Mr. Smith filed suit against defendant on January 17, 2006.

Edgar Woodridge

Edgar Woodridge worked for the defendant for thirty-eight (38) years, from 1971 to 2009[1]. He said that early in his career with the defendant, there was no hearing protection offered. When the noise became too bothersome, he would put cotton in his ears. He said that when he went home after work, his hearing seemed to return to normal. When hearing protection was offered by his employer, he wore it and continued to do so until he retired. The defendant first conducted a hearing test on Mr. Woodridge in 1976. At that time, he had normal hearing in his right ear, and slight high frequency sensorineural hearing loss in his left ear. He testified that no employee of the defendant explained to him the results of the test conducted in 1976, or of any of the subsequent hearing tests he underwent during his employment. With regard to forms signed by him following hearing tests, including ones in 2000, 2001 and 2003, Mr. Wood-ridge acknowledged signing the forms but denied authorship of the marks, checks and insertion of some information on those forms.
With regard to an audiogram conducted on October 10, 2000, which indicated that he had mild loss of hearing in his right ear and mild to moderate loss in his left ear, Mr. Woodridge testified that he was never informed of the test results. As for an audiogram conducted on him at Chalmette Medical Center on November 20, 2003, Mr. Woodridge stated that he was never made aware of test |12results, which showed that he had a mild to moderate hearing impairment. He also reported ringing in his ears at that time. He testified that he “probably asked questions” at Chalmette Medical Center, but could not recall what they were. He stated that no one employed by defendant ever informed him that he had hearing loss caused from exposure to noise at the workplace.
Mr. Woodridge consulted with audiologist Dr. Phillip Wilson, who informed him by letter dated July 18, 2005, that he had “a moderate high frequency hearing impairment in which occupational noise exposure is more likely than not a contributory factor.” Mr. Woodridge filed suit against the defendant on March 15, 2006.
*83 In Becker v. Murphy Oil Corp., 2010-1519, p. 89 (La.App. 4 Cir. 6/2/11), 70 So.3d 885, 911-12, writ denied, 2011-1750 (La.11/23/11), 76 So.3d 1154, this Court, citing Guillot v. Daimlerchrysler Corp., 2008-1485, pp. 4-5 (La.App. 4 Cir. 9/24/10), 50 So.3d 173, 180, discussed the doctrine of contra non valentem, and specifically, the law regarding the provision of the doctrine that allows prescription to be suspended when the cause of action is not known or reasonably knowable by the plaintiff:
This Court has held that “[prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong.” Hoerner v. Wesley-Jensen, Inc., 95-0553, pp. 3-4 (La.App. 4 Cir. 11/20/96), 684 So.2d 508, 510 (quoting Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La.1987)). Rather, prescription begins to run against a claimant when he obtains actual or constructive knowledge of facts indicating a cause of action. Campo v. Correa, 2001-2707, pp. 11-12 (La.6/21/02), 828 So.2d 502, 510. Constructive knowledge of facts “is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry.” Campo, 2001-2007 [2001-2707], p. 12, 828 So.2d at 510-11. Constructive knowledge is also “tantamount to knowledge or notice of | ^everything to which a reasonable inquiry may lead,” and is sufficient to commence the running of prescription. Id., p. 12, 828 So.2d at 511. Mere apprehension that something could be wrong, however, is not considered constructive knowledge sufficient to begin the running of prescription. In re Medical Review Panel of Howard, 573 So.2d 472, 474 (La.1991); Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574, 577 (La.1980). (Emphasis added).
In reasons for judgment, the trial court summarized the testimony of two of plaintiffs’ witnesses, Dr. Lawrence Weprin, an otolaryngologist, and Dr. Ross Roeser, an audiologist, as follows:
Hearing loss from chronic occupational exposure to loud noise is gradual and insidious and develops imperceptibly over time. The hearing loss is painless, progressive and permanent and not obvious to the individual Plaintiffs. Exposure to loud occupational noise may cause ringing in ears, but it subsides, allowing recovery when the source of the noise is no longer present. A threshold shift may follow unknown to the employee. This may go on for years and then finally you don’t recover, but you are not aware of it.
As the trial court further noted:
Even if an employee knows or should have known he was suffering from hearing loss, the cause of such a hearing loss or, at least, a significant contribution to a hearing loss may be caused by a variety of conditions or maladies. A plaintiff cannot be charged with knowledge of a medical condition simply because he has become aware that his condition could have been caused due to one of various causes. Cole v. Celotex, 620 So.2d 1154 (La.1993).
The trial court considered the plaintiffs’ limited education and medical sophistication, and determined that they were unable to discern the cause or relationship between their hearing loss and their employment before they were informed of this connection by an audiologist referred to them for consultation by their attorney in 2005. Whether or not they were informed by their employer that | 14they had hearing loss, which some of the plaintiffs dispute, the trial court accepted that plaintiffs’ testimony that they were never told that their hearing loss was caused by long- *84 term exposure to noise in the workplace. Most of the plaintiffs testified that they attributed their hearing loss to the aging process. As for documents signed by plaintiffs indicating the results of hearing tests conducted on them while employed with the defendant, the trial court accepted plaintiffs’ testimony that either the test results were not explained to them or certain information listed on the forms was not there when the forms were signed.
With the exception of plaintiff, Tommy Smith, who died prior to trial and whose testimony was offered by deposition, the trial court observed the plaintiffs as they testified and found each to be credible. Because the trial court was in the best position to evaluate the credibility of the witnesses, we cannot say that his determination was unreasonable.
We are mindful of the fact that our standard of review is not whether we would have weighed the evidence differently; rather, the standard is whether the trial court’s determinations were manifestly erroneous or clearly wrong. Adhering to that standard, we do not find that the trial court’s ruling that the doctrine of contra non valentem operated to suspend the running of prescription in this case was manifestly erroneous or clearly wrong.[2]
Defendant further argues that the trial court erred in finding the defendant liable to plaintiffs under theories of negligence and strict liability. The trial court noted that the concepts of negligence and strict liability are embodied in the Louisiana Civil Code under Article 2815, pertaining to negligence, and under 115ArticIes 2317 and 2322, pertaining to strict liability and liability of a premises’ owner or custodian. The trial court found the defendant liable in strict liability as the owner and custodian of a defective thing that causes injury or damage, and further found the defendant negligent for breaching its duty to provide plaintiffs with a safe place to work, and found that this breach caused damage to plaintiffs.
Before discussing the issue of liability, we must state that we find no merit in defendant’s argument that the trial court’s reasons show that he did not apply any standard, much less the proper standard, to the plaintiffs’ strict liability claims. The trial court mentioned the applicable code articles, and clearly followed the law under these articles. In any event, because there is ample evidence to support the trial court’s finding of negligence on the part of the defendant, we need not reach the issue of whether the defendant is also liable under a strict liability theory of recovery.
In Perkins v. Entergy Corp., 2000-1372, 2000-1387, 2000-1440, p. 7 (La.3/23/01), 782 So.2d 606, 611, the Louisiana Supreme Court set forth the elements necessary to prove a negligence claim, as follows:
Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis. The determination of liability under the duty/risk analysis usually requires proof of five separate elements: (1) proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (2) proof that the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant had a duty to conform his *85 conduct to a specific standard (the duty element); (4) proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). Boykin v. Louisiana transit Co., Inc., 96-1982, pp. 8-9 (La.3/4/98), 707 So.2d 1225, 1230 (citing David W. Robertson et al., Cases and Materials on Torts 83-84 (1989); Fowler v. Roberts, 556 So.2d 1 (La.1989) (on original hearing)). See also Roberts v. Benoit, 605 So.2d 1032, 1051 (La.1991). If the plaintiff fails to prove any one element by a preponderance of the evidence, the defendant is not liable. See Mathieu v. Imperial Toy Corporation, 94-0952, p. 11 (La.11/30/94), 646 So.2d 318, 326.
At trial, the defendant provided voluminous evidence as to its “Hearing Conservation Program” and its alleged compliance with federal requirements of the Occupational Safety and Health Administration (“OSHA”). Defendant argues that it has, for decades, protected its workers from the risk of hearing loss from noise exposure. According to the defendant, the measures it has taken toward protection of its workers include: 1) audiograms of employees, 2) sound surveys of areas of the refinery, 3) provision of multiple forms of hearing protection, 4) training and counseling, 5) signs indicating areas where hearing protection is mandated, and 6) the employment of on-site nurses at the refinery.
While acknowledging that the defendant took some steps to address noise exposure in its workplace, the trial court found that the defendant did not do enough to protect its workers from noise-induced hearing loss. Even assuming arguendo that the defendant complied with federal OSHA regulations, which is disputed by plaintiffs, the trial court found that such compliance will not necessarily preclude a finding of negligence under Louisiana civil law.
After hearing the differing expert testimony offered by plaintiffs and defendant, the trial court noted that while the defendant presented testimony that noise levels at the refinery were well below the permissible OSHA levels, plaintiffs presented testimony that the sound surveys conducted by the defendant grossly [ ^underestimated the noise levels at the refinery. Plaintiffs’ evidence also questioned the validity of the sound surveys conducted by the defendant, and the effectiveness of hearing protection measures taken by defendant.
On the issue of causation, the trial court was faced with conflicting expert witnesses, including that of otolaryngologist, Dr. Lawrence Weprin, who testified for plaintiffs and opined that the plaintiffs’ hearing loss was substantially caused by their occupational noise exposure at defendant’s refinery, and of Dr. Alvin Katz, who testified for the defendant and opined that the type of hearing loss suffered by at least four of the five plaintiffs was inconsistent with long-term occupational noise exposure, and that noise at the defendant’s refinery was not the cause of plaintiffs’ hearing loss. All of the plaintiffs in this case have been diagnosed with high frequency bilateral hearing loss. The trial court accepted the testimony that the defendant was negligent in breaching its duty to provide a safe workplace for its employees with regard to noise exposure, and that this breach of this duty caused plaintiffs to suffer hearing loss. We do not find those determinations to be manifestly erroneous or clearly wrong.
Finally, the defendant argues that the trial court erred in limiting the testimony of plaintiff, Edgar Woodridge, and excluding testimony that is relevant to the issue *86 of prescription. When defense counsel attempted to question Mr. Woodridge as to whether he was aware that several other employees at the refinery had filed lawsuits, plaintiffs’ counsel objected on the grounds that the question was irrelevant. The trial court sustained the plaintiffs’ objection.
The issue of whether evidence is relevant lies within the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent clear abuse of discretion. Seddon v. Simpson, 2001-2873, p. 19 (La.App. 4 Cir. 4/17/02), 816 So.2d 915, 924-925, citing Ibieta v. Star Casino, Inc., 98-0314, p. 6 (La.App. 4 Cir. 10/7/98), 720 So.2d 143, 146. We find no abuse of the trial court’s discretion in this evidentiary ruling.
For the reasons stated above, the trial court judgment is affirmed.
AFFIRMED

. Mr. Woodridge continued his employment with the defendant for three (3) years following the filing of his lawsuit in 2006.

. We agree with the trial court that the case of Sellers v. Lykes Bros. Steamship Co., Inc., 94-1107 (La.App. 4 Cir. 12/28/94), 648 So.2d 496, is distinguishable from the instant case. The plaintiff in Sellers waited twenty (20) years after he retired to sue his former employer, and presented no evidence as to when he discovered that his hearing loss might be reasonably connected to his former employment.