668 So.2d 347 (1996)
Burton OLIVIER et ux.
v.
Patrick D. LeJEUNE, et al.
No. 95-C-0053.
Supreme Court of Louisiana.
February 28, 1996.
Rehearing Denied March 29, 1996.
*348 Leon Elzear Roy, III, Roy, Forrest & Lopresto, New Iberia, for Applicant.
J. Minos Simon, Lafayette, for Respondent.
WATSON, Justice.[*]
The issues are whether the trial judge abused his discretion in admitting into evidence a surveillance videotape of the plaintiff and whether the court of appeal properly reviewed the jury's judgment de novo.

FACTS
On October 18, 1991, Burton Olivier was driving on Highway 347 in St. Martin Parish with his wife, Shirley Olivier, as a guest passenger. A van driven by Patrick LeJeune exited a parking lot onto Highway 347 and collided with the right side of the Oliviers' car. The Oliviers filed suit for damages against LeJeune; State Farm Mutual Automobile Insurance Company, LeJeune's automobile liability insurer; and Allstate Insurance Company, the Oliviers' uninsured/underinsured carrier.[1] The plaintiffs alleged Mr. Olivier injured his lower back in the accident and Mrs. Olivier sustained a loss of consortium. Defendants requested a jury trial but stipulated liability; the jury's sole function was to assess damages.
At trial, Mr. Olivier testified that he worked 37 years as an oilfield industry laborer before his 1988 retirement (after a disabling heart attack). He had been diagnosed with a congenital spinal defect, spondylolisthesis, almost 30 years before the accident. This condition had been asymptomatic and had not caused him significant back problems. Mr. Olivier told the jury about his activities prior to the accident and the back pain which limits his current activities. Mrs. Olivier testified to the change in her husband and his activities since the accident.
Plaintiffs presented the testimony of three medical doctors who treated Mr. Olivier after the auto accident. Diagnostic testing confirmed the presence of spondylolisthesis and pre-existing disk disease at the L5-S1 level. Conservative treatment was prescribed including a back brace, analgesics, muscle relaxants, steroid injections and physical therapy. Fusion surgery was discussed as an operative cure if Mr. Olivier determined his back pain interfered with his everyday activities. (This choice would be complicated by Mr. Olivier's heart condition.) Given Mr. Olivier's long history of asymptomatic labor in the oil industry, two of the doctors testified that the accident probably aggravated his spondylolisthesis. They also testified, however, that Mr. Olivier's back pain could have been activated by normal, everyday activities.
The parties stipulated that fusion surgery would cost between $25,500 and $28,500, with an additional $1,000 for an anesthesiologist. After plaintiffs rested their case, defendants introduced a surveillance videotape showing Mr. Olivier engaged in various activities a few days prior to trial. Plaintiffs objected and called Mr. Olivier in rebuttal.

TRIAL COURT
At the trial's conclusion, the jury awarded Mr. Olivier $5,500 for past medical expenses and $1,000 for past physical and mental pain and suffering, mental anguish and anxiety. The jury awarded nothing for future physical and mental pain and suffering, mental anguish and anxiety, physical disability and loss of enjoyment of life, or loss of consortium. The jury found that Mrs. Olivier did not suffer a loss of consortium and awarded her no damages for loss of consortium, service and society, mental pain and suffering, or mental anguish and anxiety. The plaintiffs filed a motion for judgment notwithstanding the verdict and additur, or, in the alternative, for a new trial. The trial judge denied the motion except to increase Mr. Olivier's award for past medical expenses to $8,835.22.

COURT OF APPEAL
The court of appeal reversed, finding the trial judge abused his discretion by admitting *349 the surveillance videotape into evidence since it did not impeach Mr. Olivier's testimony and gave a false impression of Mr. Olivier's back injury. Olivier v. LeJeune, 94-697 (La.App. 3 Cir. 12/7/94); 649 So.2d 753. The court of appeal found the videotape's admission prejudiced the jury and tainted the damage award. The court of appeal decided this evidentiary error negated application of the manifest error standard of review.[2] Accordingly, the court of appeal conducted a de novo record review to determine the appropriate amount of damages. The court of appeal awarded Mr. Olivier $150,000 for past, present and future pain and suffering, $29,500 for the future medical expenses of fusion surgery, and $8,335.22 for past medical expenses.[3] The court of appeal awarded Mrs. Olivier $15,000 for loss of consortium. A writ was granted to review the court of appeal judgment. 95-0053 (La. 4/7/95); 652 So.2d 1339.

LAW AND DISCUSSION
As noted by the trial court in denying the motion for judgment notwithstanding the verdict;
[T]he mere fact that a party stipulates as to liability does not in and of itself indicate an admission that he is responsible for all damages which may be alleged to have resulted from it. The burden remains with the plaintiff to establish by a preponderance of the evidence that the injuries claimed to have been sustained by the defendants as a result of the accident were actually sustained by the plaintiff, and also bears the burden of proving the amounts or the dollar value of such damages. Vol. 3, p. 625.
As the fact finder, the jury was required to evaluate the plaintiffs' credibility concerning the damages claimed. Relevant evidence which reflected the plaintiffs' credibility was admissible. La.C.E. arts. 401, 402.
At trial, Mr. Olivier testified that he had had no significant back pain before the auto accident but told his doctors about the earlier spondylolisthesis diagnosis and prior intermittent back pain. He formerly shared outside work with his wife, raking and working in the garden. He used to cook. He and his wife traveled and played long card games. They enjoyed a sexual relationship.
Since the accident, Mr. Olivier testified his back becomes painful from sitting or standing too long and he must take aspirin. He has become tense, frustrated and upset and cannot cope with people as he would like due to the back strain. He can no longer play cards or travel because he cannot sit for long periods of time without back pain. He and his wife no longer enjoy a sexual relationship. A change in the weather affects his back.
Mr. Olivier testified that some activities are still possible for him. He takes short walks and rides his bicycle. He works on his car, including washing and cleaning the car, changing the oil and greasing the door hinges. In order to get underneath the car, Mr. Olivier lies on a mechanical creeper and rolls under the car. He works on crafts and makes yard ornaments. He does this by bending over a table on which he paints pieces of wood. He can still garden if he takes aspirin beforehand. He estimated that he could lift 20-25 pounds from the ground but that weight would strain his back.
One month prior to trial, Mr. Olivier gave sworn deposition testimony on November 6, 1993. At trial, defense counsel cross-examined Mr. Olivier about prior inconsistent deposition statements concerning his back pain and his restricted activities.
At his deposition, Mr. Olivier stated he never had a back problem prior to the accident. *350 At trial, Mr. Olivier admitted he had prior intermittent back pain and had been previously diagnosed with a congenital spinal defect. In deposition, Mr. Olivier stated his back pain manifested itself a week after the accident and he related this on his first doctor's visit. At trial, the doctor testified that Mr. Olivier's first complaints were of right shoulder pain and chest pain; Mr. Olivier did not complain of back pain until two weeks after the accident. In deposition, Mr. Olivier stated that his wife did all the yard work after his 1988 heart attack. At trial, he testified he and his wife shared the yard work until the auto accident. In deposition, Mr. Olivier mentioned inability to help with the house and yard work as his only accident limitations. At trial, he expanded those limitations to include the inability to travel and play cards. Finally, Mr. Olivier stated at trial that between his deposition, one month prior to trial, and the trial, he slowed down his activities. He decided to undergo fusion surgery after his deposition, despite his fear, due to unbearable back pain.
Defense counsel introduced a transcript of Mr. Olivier's deposition into evidence for impeachment purposes. Thus, the jury had before it differing sworn statements regarding Mr. Olivier's back injury. Defense counsel next sought to introduce into evidence a surveillance videotape which showed Mr. Olivier performing various activities one week prior to trial. Although the activities shown on the videotape were consistent with Mr. Olivier's trial testimony, they were inconsistent with his earlier sworn deposition.
Plaintiffs objected to the admission of the videotape arguing that the acts captured on the videotape were not inconsistent with Mr. Olivier's trial testimony and, therefore, the videotape was inadmissible as impeachment evidence. Additionally, the plaintiffs objected to the admission of the videotape as direct evidence, arguing that its probative value was outweighed by its prejudicial effect and that the tape would not assist the jury in determining damages.
La.C.E. art. 607(D) provides:
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
Plaintiffs argue, and the court of appeal found, that since the videotape did not contradict Mr. Olivier's trial testimony, the trial judge abused his discretion in finding the videotape admissible as impeachment evidence. The trial court found that argument to be meritless because
Mr. Olivier testified that many of his previous activities were curtailed or restricted because of his inability to do certain things because of his back; whereas, the video tape shows clearly that Mr. Guillot [sic; Olivier] could bend, could stoop, and could lift items without apparent difficulty. Vol. 3, p. 523.
* * * * * *
The question of whether or not Mr. Olivier can do the things which he claims he can do or can't do the things which he claims he can't do is a matter which is a matter of fact which addresses itself to the trial jury and not to this Court. Vol. 3, p. 525.
Further, since the jury was presented with differing sworn statements regarding the plaintiff's claimed injury, the defendants were entitled to introduce evidence which tended to show that the plaintiff's testimony had changed over time. This conclusion is strengthened by the temporal factor present here. One month prior to trial, the plaintiff described his limitations and other details regarding his claimed injuries in a certain way. After a surveillance videotape was filmed and provided to plaintiffs' counsel pursuant to continuing discovery requests, (Defendants' Brief, p. 7, 13), the plaintiff's trial testimony differed from his previous *351 sworn statement and conformed to the videotape. These circumstances are relevant to a witness credibility determination. Similar circumstances may arise frequently because Moak v. Illinois Cent. R. Co., 93-0783 (La. 1/14/94); 631 So.2d 401, held, inter alia, that surveillance films are discoverable whether or not they will be used at trial.
"The determination of whether motion pictures or video tapes are admissible is largely within the discretion of the trial court." Lafleur v. John Deere Co., 491 So.2d 624, 632 (La.1986). As previously noted in the context of a worker's compensation case,
evidence in the form of moving pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain during or after the activity.
Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65, 68 (La.1983).
In this case, the trial judge viewed the surveillance videotape in camera. Out of the jury's presence, the legal investigator who filmed Mr. Olivier was questioned and cross-examined. The trial judge specifically found the defense established a proper predicate for the videotape's introduction. The trial judge reviewed jurisprudence admonishing trial courts to be careful and cautious in admitting videotapes due to the possibility of juror confusion or misinformation. After determining the videotape was admissible, the trial judge did not limit either party from making such arguments to the jury as they deemed necessary and advisable. The trial judge did not preclude further testimony by Mr. Olivier to explain the videotaped activities.
The plaintiff availed himself of the opportunity offered by the trial judge to counter any false impression the videotape may have made. After the defense played the videotape to the jury without comment, the plaintiff again showed the videotape and described each action presented. Mr. Olivier estimated the approximate weight of each item he was viewed lifting. Nothing contradicted his earlier estimation of his 20-25 pound lifting capacity. Each videotaped activity conformed to actions he had earlier admitted being able to accomplish. He additionally testified that he was taking pain medication when the videotape was filed. The plaintiff was not prejudiced by the videotape since it showed nothing more than the plaintiff engaged in activities which he admitted he was capable of performing. See Lafleur, 491 So.2d at 632.
Considering these circumstances, the court of appeal erred in finding the trial judge abused his discretion in admitting the videotape into evidence and in reviewing the jury's award of damages de novo. Much discretion is left to the fact finder's reasonable assessment of damages. La.C.C. art. 1999. In reviewing a damage award, the appellate court "is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

CONCLUSION
Under the circumstances presented here, the trial judge did not abuse his discretion in admitting into evidence the surveillance videotape of the plaintiff. The court of appeal judgment is vacated and the matter is remanded to the court of appeal to review the award of damages under the "much discretion" standard of review.
VACATED AND REMANDED.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, Justice, dissenting.
I respectfully dissent.
Extrinsic evidence is evidence obtained from a source other than the direct questioning of the witness. The use of extrinsic evidence, including videotapes, for impeachment purposes is governed by La.Code E. art. 607 D which provides as follows:
Attacking credibility extrinsically. Except as otherwise provided by legislation:

*352 (1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
However, before extrinsic evidence to impeach a witness can be introduced, a proper foundation must be laid pursuant to La.Code E. art. 613 which provides as follows:
Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects or of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.
(emphasis added).
Under art. 613, if after being confronted with the fact, the witness admits the fact, the evidence is not probative of the witness's credibility. That is, upon admission by the witness, the evidence does not challenge his truthfulness and, consequently, it is not impeachment evidence admissible under arts. 607 and 613.
The use of videotapes in litigation has burgeoned in recent years. Ashley S. Lipson, Art of AdvocacyDemonstrative Evidence, § 13.02[2] (1995). Frequently, defense attorneys hire private investigators to film surveillance videotapes capturing the plaintiff participating in physical activities inconsistent with his claimed injuries and limitations. Lipson, at § 13.02[3]ii. Discovering the truth, such as indications of pain by the plaintiff or the need for medication or rest after physical exertion, is rarely the aim of a surveillance videotape. Where the goal and job is to find damaging evidence, a great potential for abuse exists. That is, surveillance videotapes provide manifold opportunities for fabrication and misrepresentation. For instance, an injured plaintiff may be filmed picking up a large object with ease. The camera would fail to show whether the object was relatively light or whether, afterwards, the plaintiff experienced debilitating pain and was unable to engage in further physical activities. Thus, a surveillance videotape is naturally suspect. Although videotapes are intended to give the impression of an objective reality, they are, in fact, merely a product of the point of view of the video camera operator. The video camera operator can create a false impression through selectively choosing when to turn the camera on and off. Nonetheless, once a videotape is introduced into evidence, it somehow takes on the aura of objective truth. Moreover, videotapes make a lasting impression on a jury. Not surprisingly, the danger for undue prejudice is immense. Id. § 13.01-.06.
The admissibility of videotapes is largely within the discretion of the trial court. Lafleur v. John Deere Co., 491 So.2d 624 (La. 1986). Nonetheless, this court has previously noted that "evidence in the form of moving pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain during or after the activity." Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983).
After reviewing Mr. Olivier's testimony and the videotape, I believe that the videotape did not contradict or discredit Mr. Olivier's testimony. Thus, the evidence did not challenge his truthfulness. Accordingly, I believe that the court of appeal correctly concluded that the videotape was inadmissible as impeachment evidence under arts. 607 and 613.
In addition to being inadmissible as impeachment evidence, I regard the videotape as being inadmissible as direct evidence on the issue of quantum presented to the jury. Generally, relevant evidence is admissible. La.Code E. art. 402. However, even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." La.Code E. *353 art. 403. After viewing the videotape, I consider its probative value as being far outweighed by its prejudicial nature. The videotape provided no assistance to the jury to resolve the only issue before it, the assessment of damages. In fact, the videotape was somewhat misleading when viewed. Although the time and dates are revealed on the screen for the viewer, the viewer's focus is naturally on the activities that take place. Due to editing, the tape is only 30 minutes long and, during this 30 minute period, the viewer is left with the sensation that Mr. Olivier engages in a great deal of non-stop activity. In reality, his tasks were performed over a three day period and were not performed successively. Reviewing the record, it is unquestionable that the tape dominated the evidence regarding Mr. Olivier's physical condition. As noted by the trial judge in his reasons for judgment on the motion for judgment notwithstanding the jury verdict and, alternatively, motion for new trial, "[o]bviously the jury was impressed with this evidence." Clearly, the probative value of the videotape was outweighed by its prejudicial effect and, thus, I consider correct the court of appeal's conclusion that the trial judge abused his discretion in admitting the videotape and that the videotape was inadmissible.
When a trial court makes a consequential and erroneous ruling in the exclusion or admission of evidence the "manifestly erroneous" or "clearly wrong" standard should not be used by the court of appeal to review the jury's decision. McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986). The manifestly erroneous or clearly wrong standard assumes that consequential evidentiary rulings were correct and proper. Thus, the manifestly erroneous or clearly wrong standard of appellate review applies only to a jury verdict resulting from a properly conducted trial, not verdicts tainted by consequential erroneous evidentiary rulings. In such instances, no weight should be accorded the trial court judgment which adopts the jury's verdict. Rather, the court of appeal should review the entire record and decide the issues presented de novo. Id.; see also Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). Here, the jury's verdict was tainted by the trial court's consequential error in admitting the surveillance videotape. Thus, I believe that the court of appeal correctly conducted a de novo review of the record to assess damages. Moreover, I find that the record fully supports the court of appeal's quantum award. Accordingly, contrary to the decision by the majority, I would affirm the court of appeal's judgment in favor of Mr. and Mrs. Olivier.
NOTES
[*] Judge Ned E. Doucet, Court of Appeal, Third Circuit, sitting by assignment in the vacancy created by the resignation of Dennis, J.

Calogero, C.J., not on panel. Rule IV, § 3.
[1] Allstate was later dismissed from the suit.
[2] Since the court of appeal was reviewing an award of damages, the standard of review should have been to determine whether the fact finder abused its discretion in determining an appropriate award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); La.C.C. art. 1999.
[3] The jury awarded Mr. Olivier $5,500 for past medical expenses and the trial judge increased the award an additional $3,335.22 in his ruling on the motion for additur for past medical expenses. Thus, the trial court's award for past medical expenses totalled $8,835.22. The court of appeal erred in stating the award was increased from $5,500 to $8,335.22. This may be attributed to the trial court's reasons for judgment, which reflect the same error.