720 So.2d 143 (1998)
Alice IBIETA
v.
STAR CASINO, INC., and XYZ Insurance Company.
No. 98-CA-0314.
Court of Appeal of Louisiana, Fourth Circuit.
October 7, 1998.
*144 Robert E. Arceneaux, Jerry B. Jordan, Travis L. Bourgeois, Barham & Arceneaux, New Orleans, for Plaintiff-Appellant Alice Ibieta.
Daryl A. Higgins, Wade A. Langlois, III, Windhorst, Gaudry, Ranson, Higgins & Gremillion, Gretna, for Defendant-Appellee Star Casino, Inc.
Before SCHOTT, C.J., and JONES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Alice Ibieta sued Star Casino, Inc. ("Star") for damages she allegedly sustained on 8 February 1994 when the car she was driving was struck by a car driven by Dianne Hills on Star Casino Boulevard, a street controlled by Star. Mrs. Ibieta claimed her damages were caused by Star's negligence in failing to properly control Star Casino Boulevard, failing to post traffic signs or signals to show the direction in which vehicles should travel, faulty design of ingress and egress to and from Star's casino, and failure to institute or adopt consultant engineering reports to correct the traffic flow.
The trial court granted the Star's motion to exclude evidence of changes to Star Casino Boulevard's signs and pavement markings added after the alleged accident, and to exclude a videotape taken by the Ibietas of Star Casino Boulevard over a week after the alleged accident.
Following trial, a twelve person jury found that Star was not guilty of negligence which was a proximate cause of the accident. The trial court granted the defendants' motion for a directed verdict dismissing the Ibietas's strict liability claim and entered judgment on the jury verdict, dismissing Mrs. Ibieta's negligence suit against Star and its insurer. The Ibietas appeal from that judgment.

STATEMENT OF FACTS
The Ibietas contend that the accident was caused by Dianne Hills's confusion as to the direction of the traffic on Star Casino Boulevard. This confusion, according to the Ibietas, arose from a lack of clear signage indicating that both lanes of traffic were to proceed in the same direction, toward the casino.
Vincent Saladino, assistant manager of the Quarter House Resort, testified that at the time of the alleged accident he was Star's director of property management. He is an operating engineer and a licensed electrical contractor, air conditioning/refrigeration contractor, gas contractor first class, with an operating engineering license in air conditioning and boilers and second class operating engineer's license in internal combustion engines. His duties with Star included oversight of Star's physical properties including parking lots. Star Casino Boulevard was a two-lane one-way street from the time the casino opened in November, 1993, approximately three months before the accident. A broken white line separated the two lanes of traffic, indicating a two-lane one-way street.
Prior to the casino's opening, Star obtained permits from the city, the state and the state gaming board. All construction had to be *145 completed prior to issuance of the permits. Saladino testified that because gambling was controversial, Star was under intense scrutiny from all the civic authorities and from the media, and everything had to be done strictly according to law. From the casino's opening in autumn of 1993 until the date of the accident, Star had not received any notification from any governmental body or office suggesting that the Star was not in compliance with required traffic designs.
Saladino was cross-examined concerning his discussions with Dennis Finigan of Urban Systems, the subcontractor that formulated Star's original traffic plan as well as a plan for signage enhancement. Saladino testified that prior to these discussions in his travels through the Star property he had seen people going against the flow of traffic when they reached the end of the various parking lots. His first reaction was to call the engineers at Urban Systems who had designed the system and who reassured him that everything had been properly done, and, if anything, the directions were a bit overdone. He told the engineers that people were still driving against the traffic flow. Saladino asked the Levee Board police on patrol about the problem, and no one could give him an answer. He was concerned and bewildered by the fact that accidents had occurred caused by cars going down the wrong way on Star Casino Boulevard despite the fact that every intersection had a sign denoting the direction of traffic, the lanes were marked with proper broken white striping between the traffic lanes and the edges were properly striped. Saladino testified to his belief that the drivers disregarded the signage out of laziness to avoid having to circle back through Star Casino Boulevard if they were unable to find a parking place in the lot they were exiting. In light of the apparent disregard of the existing signage by casino patrons, Star asked Urban Systems to prepare a plan of suggested enhancements to the signage. Saladino identified a diagram submitted by Urban Systems dated 18 January 1994, three weeks before the accident in question, showing the proposed addition of a sign indicating the right lane was for authorized vehicles only and of a double-arrow sign showing the left lane as the turning lane for the casino terminal and limiting the right lane to authorized vehicles. Saladino testified that even after the signage enhancements and active enforcement by the Levee Board drivers continued to ignore the signs indicating the proper traffic pattern.
Jackie Rice testified that she had been going into the casino "maybe two or three times a week" and played cards there with Mrs. Ibieta. Rice testified that sometime in late January or early February she drove in the right-hand lane of Star Casino Boulevard, believing the street to be a two-way street, and was stopped by a policeman. About three weeks later, she visited the casino and noticed that arrows had been added showing the one-way direction of traffic. She admitted on cross-examination that she knew that a broken white line indicates a one-way street, and that she was not confused by the signage but by the fact that she saw cars going both ways on the one-way street.
Ms. Ibieta testified that she believed Star Casino Boulevard was a two-way street at the time of her accident. When asked why she was travelling in the left lane of a twoway street at the time of the accident, she testified that she "knew of the changes." She said that she was travelling unrestrained by a seat belt in the left lane at about 10:00 or 10:30 a.m. when a car travelling in the right lane slightly ahead of her turned in front of her without braking or signalling and struck the side of her car, jolting her to the side. She testified on cross-examination that although she believed there was confusion about the direction of the traffic on Star Casino Boulevard, she nonetheless travelled in the left hand lane.
Dennis Finigan, an employee of Urban Systems, a consulting and traffic engineering firm, testified that his firm did all the engineering and consulting work for Star. According to Finigan, Saladino asked the firm to prepare a plan to alleviate a traffic problem. On 18 January 1994, Urban Systems prepared a traffic control recommendation for Star at Saladino's request, adding the double-arrow sign slightly before midway in the parking area. A subsequent recommendation *146 dated 7 February 1994, the day before the accident, provided for changes in delivery signage. Finigan also confirmed that the City of New Orleans Department of Streets had reviewed the original traffic plan, and confirmed that Star had no obligation under law, ordinance or other requirement to paint an arrow in the roadway.
Dianne Hills testified that she was the driver of the car that struck Mrs. Ibieta. Hills was a professional bus driver, and testified that Star Casino Boulevard always, including at the time of the accident, had a white line between the two traffic lanes, and knew that such a line designated a one-way street. In fact, she had never seen a street so marked that carried two-way traffic. Despite that knowledge, she testified that she believed the Boulevard was a two-way street at the time of the accident. She testified that just prior to the accident, she put on her left-hand turning signal, looked into her rear view mirror and both side mirrors, hit her brakes and, seeing nothing, turned left from the right lane and struck Mrs. Ibieta's car. It is this testimony that most likely influenced the jury to decide that the accident was caused by Hills' negligence and not by unclear signage.

STANDARD OF REVIEW
The Ibietas suggest that since evidentiary rulings involve questions of law, they should be reviewed de novo by this Court. However, the question of whether evidence is relevant or not is within the discretion of the trial court and its ruling will not be disturbed absent a clear abuse of discretion. Citizens Bank and Trust Co. v. Consolidated Terminal Warehouse, Inc., 460 So.2d 663 (La.App. 1 Cir.1984), citing Ketcher v. Illinois Central Gulf R. Co., 440 So.2d 805 (La.App. 1 Cir.1983), writs denied, 444 So.2d 1220, 1222 (La.1984). Admission of videotaped evidence is likewise within the discretion of the trial court. Lafleur v. John Deere Co., 491 So.2d 624 (La.1986).
The findings of the trier of fact are reviewed under the manifest error standard. It is well settled that a court of appeal may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614.
It is only where trial court legal errors have tainted the fact finding process that the verdict is not reviewed under the manifest error standard and, if the record is complete, the appellate court may make a de novo review of the record and determine the preponderance of the evidence. Rosell v. ESCO, 549 So.2d 840, 844 fn. 2 (La.1989); Gonzales v. Xerox Corp., 320 So.2d 163 (La. 1975).
Likewise, the trial court's determination of lack of an unreasonably dangerous condition, upon a motion for a directed verdict, is reviewed under the manifest error standard. Reed v. Wal-Mart Stores, Inc., 97-1174 p. 1 (La.3/4/98), 708 So.2d 362, 363.

FIRST ASSIGNMENT OF ERROR: The district court erred in excluding photographs of planned improvements to Star Casino Boulevard.
The Ibietas sought to introduce photographs showing signage changes made to Star Casino Boulevard after the accident. In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. La. C.E. art. 407. This Article does not require exclusion of such evidence when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility. Id.
The Ibietas contend that the photographs do not show subsequent remedial measures since Star had already contracted at the time of the accident with Urban Systems to upgrade the signage and, alternatively, that the photographs fall within the exception to the evidentiary rule allowing for proof of knowledge, feasibility and control.
*147 We find no authority for the proposition that the mere fact that a preliminary planned change was under consideration at the time of an accident makes La.C.E. art. 407's proscription inapplicable. According to the testimony of record, the final plan was not submitted to Star until after the accident. We therefore do not find that the trial court's decision to prohibit introduction of the photographs was an abuse of its discretion.
Neither is the evidence appropriate under the statutory exceptions. Star did not place at issue its knowledge or control of the street or the feasibility of making the signage changes. The record is devoid of any suggestion at trial that knowledge, control or feasibility were questioned. Absent these issues, the photographs remain inadmissible.
Our review of the record demonstrates that the evidence concerning Star's decision to hire Urban Systems to upgrade its signage, including the initial and final recommendations, already were before the jury through the testimony of Saladino and Finegan.
This assignment of error is without merit.

SECOND ASSIGNMENT OF ERROR: The district court erred in excluding the video tape and still photographs taken over a week after the accident took place.
Admission of videotaped evidence is within the discretion of the trial court. In making its determination, the trial court should consider whether the tape accurately depicts what it purports to represent, tends to establish a relevant fact, and will aid the jury's understanding. The court should weigh against those factors whether the tape will unfairly prejudice or mislead the jury, confuse the issues, or cause undue delay. Malbrough v. Wallace, 594 So.2d 428, 431 (La.App. 1 Cir.1991), writ denied 596 So.2d 196 (La.1992). The trial court may exclude the evidence if the factors favoring admission are substantially outweighed by the factors against admission. La.C.E. arts. 401-403.
We find no abuse of the trial court's discretion in ruling the videotape to be inadmissible. The trial judge expressed his concern that the tape could have been staged and that there was no showing that it reconstructed conditions at the time and site of the accident. The video was made by Mr. Ibieta, not by an unbiased third party, and was attacked by Star because of Mr. Ibieta's clear bias, the many pauses in the tape and the provocative narration by Mr. Ibieta. No foundation was offered save Mrs. Ibieta's proffered testimony that she went to the casino on 17 February 1994, that the conditions were the same as at the time of the accident, that her accident happened at the "Queen of Diamonds" parking area and that she was with Mr. Ibieta when he made the videotape and viewed it at her home.
Were we to accept the Ibietas's contention that the tape showed how the public used the street, it would remain inadmissible, since it proves only that patrons disregarded the broken white line and one way signage. The tape does not show unreasonable conduct on Star's part.
This assignment of error is without merit.

THIRD ASSIGNMENT OF ERROR: The district court erred in not instructing the jury in strict liability.
A trial judge has much discretion in determining whether or not to grant a motion for a directed verdict. The motion is properly granted when, after having considered all evidentiary inferences in the light most favorable to the mover's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the mover that a reasonable person could not arrive at a contrary verdict. Lott v. Lebon, 96-1328, 96-1328 p. 4 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, 615-16, writs denied 97-0359, 97-0414 (La.3/21/97), 691 So.2d 92, 95.
The trial court found that there was no evidence that an unreasonably dangerous condition existed. The Ibietas introduced no evidence that the signage violated any state or local regulation. Indeed, all the witnesses who addressed the issue, including Ms. Hills, admitted that a broken white line divides two lanes of one way traffic. Therefore, we find, based on the entirety of the record, that the trial court's directed verdict on the issue of strict liability is not manifestly erroneous or clearly wrong.
This assignment of error is without merit.

*148 FOURTH ASSIGNMENT OF ERROR: The jury was manifestly erroneous in not finding Star guiltu of negligence.

Our review of the record in its entirety convinces us that the jury's findings are reasonable in light of that record. We are mindful of the standard of review of the verdict of a properly instructed jury.
"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings;... [Where] a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, supra, 549 So.2d at 844-845.
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts, not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221.
Applying these standards, we conclude that the jury was not manifestly erroneous or clearly wrong in accepting the evidence offered by Star that the accident was not the result of confusion caused by its traffic patterns and signage, but by the voluntary actions of Star's patrons who, for their own convenience, ignored the signage provided by Star.
This assignment of error is without merit.

CONCLUSION AND DECREE
Having found no abuse of the trial court's discretion in the evidentiary rulings complained of, and having found that the jury verdict is not manifestly erroneous or clearly wrong, the judgment on the verdict is affirmed.
AFFIRMED.