| MICHAEL E. KIRBY, Judge.
Plaintiff, Oleysa Ivanovna Novosyolova, appeals the trial court’s judgment dismissing her claim for damages against defendants, Jack Stephens, Sheriff for the Parish of St. Bernard, and Deputy Bradley Masson.
This case arises out of an accident on September 29, 1996 on Louisiana Highway 46 (“St. Bernard Highway”) in St. Bernard Parish, Louisiana, in which a pedestrian, Igor Novosyolova (“Mr.Novosyolova”), was struck and killed by a vehicle driven by Deputy Bradley Masson of the St. Bernard Parish Sheriffs Department. The plaintiff, Mr. Novosyolova’s widow, filed a petition for damages against Jack Stephens, Sheriff for the Parish of St. Bernard, the State of Louisiana through the Department of Transportation and Development, St. Bernard Parish, and Deputy Bradley Masson of the St. Bernard Sheriffs Department. Prior to trial, the State and St. Bernard Parish were dismissed. Trial proceeded against Sheriff Stephens and Deputy Mas-son.
The issues of liability and damages were bifurcated, and the issue of liability alone was tried on July 16, 2001. Following a bench trial, the trial court rendered judgment in favor of defendants, and dismissed plaintiffs claim for damages. The plaintiff now appeals.
|20n appeal, the plaintiff urges the following assignments of error: (1) the trial court erred in admitting a videotape of the accident scene, and in relying on the defense expert’s testimony that was based in substantial part on that videotape; (2) the trial court erred in finding that Sheriff Stephens and Deputy Masson were not liable to the plaintiff because the evidence showed that Deputy Masson was inattentive, and that inattentiveness was a cause of the accident; and (3) the trial court erred in finding that Mr. Novosyolova was solely at fault for the accident because of the court’s finding that Mr. Novosyolova was walking in the travel lane of the highway.
The following testimony was presented:
Maxim Ryazantsew, one of the seamen with Mr. Novosyolova on the night of the accident, testified by deposition. He said that the tanker on which the men worked had been docked in St. Bernard Parish for repairs for several weeks before the accident. He said it was common for seamen to walk along St. Bernard Highway to go back and forth between the tanker and local restaurants and gas stations. Mr. Ryazantsew testified that Mr. Novosyolova had walked along this highway at night prior to the night of the accident.
The accident occurred at approximately 12:30 a.m. on September 29, 1996. During the hour or hour and one-half prior to the accident, Mr. Ryazantsew, Mr. Novosyolo-va and two other men were drinking beer on the ship. Mr. Ryazantsew testified that Mr. Novosyolova drank approximately two cans of beer during that time. At the time of the accident, Mr. Novosyolova, Mr. Rya-zantsew and Alexey Schtsherbakov were walking into town looking for a bar or grocery store or gas station to buy beer. The men generally walked three abreast along the right shoulder of the road. Mr. Novosyolova walked to the left of Mr. Rya-zantsew, and |3Mr. Ryazantsew walked to the left of Mr. Schtsherbakov. None of the men were drinking as they walked. The men sometimes walked single file to avoid puddles and other obstacles. Mr. Ryazantsew said the accident did not occur near one of these obstacles. He said that when the men were avoiding obstacles, none of them stepped into the travel lane.
Mr. Ryazantsew was walking so close to Mr. Novosyolova right before the accident that their shoulders touched. Mr. Rya- *31 zantsew turned to say something to Mr. Schtsherbakov a second or two prior to the impact. He heard a car approaching before the impact.' He did not hear the brakes to the car applied until the time he saw the car. When he last saw Mr. Novo-syolova prior to the impact, Mr. Novosyo-lova was walking to the right of the white line that marked the edge of the travel lane. Mr. Ryazantsew said that he could not remember exactly whether or not Mr. Novosyolova ever stepped into the travel lane during their walk, but he does not think any of the three men stepped into the travel lane. Two or three minutes before the accident, a truck drove past them very closely, so the men moved a little farther away from the travel lane. The truck came within one meter of them.
The police later asked Mr. Ryazantsew to stand where he was when the accident occurred while photographs were taken. Mr. Schtsherbakov also was asked to stand where he was when the accident occurred, and another man from the ship stood where Mr. Ryazantsew and Mr. Schtsher-bakov said Mr. Novosyolova stood. The photograph was admitted into evidence as Plaintiffs Exhibit 11, and it depicted Mr. Novosyolova as having both feet within the shoulder portion of the road, but showed his upper body protruding into the travel portion of the roadway. |4 Mr. Ryazantsew testified that he did not hear car tires swerving prior to hearing the impact.
Mr. Ryazantsew stated that he does not recall what he was wearing on the date of the accident, but he remembers that Mr. Novosyolova was wearing a medium blue shirt and dark blue pants.
Alexey Schtsherbakov testified that Mr. Novosyolova had two or three cans of beer before they left the ship on the night of the accident, but Mr. Novosyolova never appeared intoxicated to him. He said that at the time of the accident, Mr. Novosyolo-va was walking two to three meters behind him and Mr. Ryazantsew. He last saw Mr. Novosyolova approximately ten seconds before the impact. He and Mr. Ryazantsew were talking when the impact occurred. He said he heard the car approaching and saw the light from the car’s headlights. When he heard the car approaching, there were no other cars on that area of the road going in either direction. He stated that he did not hear the vehicle’s brakes being applied at any time prior to impact. He also did not hear the police car making a swerving sound prior to impact.
Mr. Schtsherbakov testified that Mr. Novosyolova was walking on the pedestrian side of the white line separating the ' travel lane and shoulder of the road. He said it was Mr. Novosyolova’s habit to always walk on the pedestrian side of the white line whenever he walked along that highway. He said as they walked on the highway that night, they gradually walked closer to where the edge of the shoulder meets the grass. He said that some nights, they walked on the opposite side of the road facing traffic. He said they were only told by their boss to walk on the shoulder; they were not told whether to walk with or against traffic. On the | Bnight of the accident, the three men walked three abreast except for when they had to go around large'puddles.
Deputy Bradley Masson of the St. Bernard Parish Sheriffs Department testified that on the date of the accident, September 29, 1996, he was assigned to the patrol division. While on duty, Deputy Masson received a call about a vehicle fire on Delacroix Highway. He proceeded toward Delacroix eastbound on St. Bernard Highway. He said he was' going about 35 to 40 miles per hour in a 45 miles per hour zone, and his lights were on low beam. He did *32 not actívate his siren or flashing lights. It was dark, and the weather was clear.
Deputy Masson said that in this particular area of St. Bernard Highway, he would occasionally see seamen walking down the side of the highway. He said he saw the three pedestrians only seconds before the impact. Deputy Masson testified that Mr. Novosyolova was walking in the travel lane of the roadway when he was struck. He stated that at the time of the accident, Mr. Novosyolova was two to three feet to the left of the white line separating the travel lane from the shoulder. He later said he did not see Mr. Novosyolova prior to impact, and swerved his car at that time and applied his brakes. The reason he did not take any evasive action such as swerving or hitting his brakes prior to the impact is because he did not see Mr. Novosyolova.
He said Mr. Novosyolova was wearing dark clothing and was walking with two companions. He said the other two men were walking on the shoulder, but were very close to the travel lane. After the impact, Mr. Novosyolova landed in the travel lane close to the shoulder. He said Mr. Novosyolova made some sort of evasive action prior to the impact. Deputy Masson said that Trooper Troy McConnell investigated the accident and prepared the police report. Deputy lfiMasson testified that he did not tell Trooper McConnell that Mr. Novosyolova was walking slightly behind his two friends or that the friends got in the way of Mr. Novosyolova getting out of the way of the police car. He said he told people after the accident that all three men were in the travel lane of the roadway; but he realized later that Mr. Novosyolova’s two companions were not in the travel lane.
In a statement Deputy Masson wrote at the hospital a couple of hours after the accident, he stated that the three men were walking abreast in the roadway. His statement also said that the closest pedestrian to the police car appeared to stumble and possibly tried to move out of the roadway but was unable to do so because of the person standing right next to him.
Trooper Troy McConnell of the Louisiana State Police testified that he investigated the fatality accident at issue in this case. When he arrived at the accident scene, several police units were already on the scene. Mr. Novosyolova had already been taken to the hospital when he arrived. Deputy Masson was still at the scene. Deputy Masson told Trooper McConnell that he was traveling approximately 40 miles per hour on St. Bernard Highway, and was not using overhead lights or a siren. He said that as he approached the intersection of St. Bernard Highway and Theresa Drive, he noticed a pedestrian in front of his vehicle in the main travel lane. He said he immediately swerved to the left to avoid hitting the pedestrian, but was unsuccessful. He struck the pedestrian with the right side of his vehicle.
At the accident scene, Trooper McConnell tried to determine the point of impact. He did this by asking Deputy Masson, Mr. Ryazantsew and Mr. Schtsherbakov to indicate where each believed the point of impact occurred. Those three men agreed as to the general location of the impact, except that Deputy |7Masson placed the point of impact in the travel lane and the two Russian men said the impact occurred six to twelve inches to the right of the line separating the travel lane from the shoulder of the roadway.
Measuring from the general area of the point of impact to where the skidmarks began, Trooper McConnell determined that Deputy Masson continued forward 80 feet from the point of impact before applying his brakes and skidded an additional 70 feet. The police unit came to rest off the *33 roadway about 20 feet beyond the westbound lane. He said Mr. Novosyolova was propelled approximately 85 feet straight ahead onto the eastbound shoulder.
Trooper McConnell testified that Deputy Masson did not tell him that he had seen three men in the distance with his headlights. Trooper McConnell found no fault on the part of Deputy Masson. He said that he could not find him at fault because he could not determine where Mr. Novosyolova was at the point of impact based on the conflicting reports between Deputy Masson and the two Russian seamen.
Trooper McConnell said that he believed Mr. Novosyolova was wearing a light colored shirt, but he was not sure. He said he gathered Mr. Novosyolova’s clothes and brought them to the coroner’s office. Every article of Mr. Novosyolova’s clothing was found to the right of the eastbound white fog line.
Regarding Deputy Masson’s statement given at Chalmette Medical Center on the night of the accident, Trooper McConnell said that Deputy Masson did not tell him that he noticed three pedestrians walking abreast on the edge of the roadway prior to the accident. He said that his investigation revealed that the three Russian seamen were walking in the same direction as traffic. He said that when he drove this same path on a subsequent evening, he could see forty feet ahead.
| sPlaintif'f s next witness was Raymond Charles Burkart, Jr., who was accepted as an expert in accident reconstruction and analysis. He testified that he investigated the September 29, 1996 accident by reviewing the police report, accompanying statements, police photographs, and depositions of Mr. Ryazantsew and Mr. Schtsherbakov. He also reviewed a police officer’s deposition, the autopsy protocol, and performed an inspection of the accident site. He performed independent measurements and prepared a diagram of those measurements.
Mr. Burkart said that in this case, there was no definitive point of impact on which all of the witnesses agreed. The dispute between the deputy involved and the two surviving Russian seamen was whether Mr. Novosyolova was on the left or the right side of the white fog line at the time of impact. The general area of the point of impact was agreed to be approximately 80 feet from where Mr. Novosyolova landed. Mr. Burkart’s inspection of the accident site took place on December 16, 2000.
Mr. Burkart testified that Louisiana law requires the low beam lights on vehicles to allow a driver to see 150 feet ahead. He stated that the first indication of a skid-mark was about 80 feet from the area of impact. He calculated the projected speed of Deputy Masson’s police unit at 28 to 35 miles per hour. Mr. Burkart stated that the reaction time of a driver at night when he perceives a danger is generally 1.0 second. At 30 miles per hour with a 1.0 second reaction time, it would take 87 feet to stop a vehicle such as the one Deputy Masson was using on the night in question. He said that the emergency stopping distance at 35 miles per hour is 109.7 feet. He opined that assuming Mr. Novosyolova was two to three feet into the roadway as stated by Deputy Masson and also assuming that Deputy Masson’s headlights were working properly, Deputy Masson should have been |9able to see Mr. Novosyolova before the impact and take evasive action such as swerving or braking. He said the absence of braking or skidding until 80 feet after impact indicates that Deputy Masson did not see the pedestrians prior to the impact. Therefore, his opinion is that the primary causative factor of this accident was Deputy Masson’s inattentiveness.
*34 On cross-examination, Mr. Burkart stated that while the reaction time of a driver at night can be slowed to 3.0 seconds due to eye accommodation for activity such as looking at the speedometer and then looking outside of the vehicle, there is no indication in this case that eye accommodation was necessary in this case. Specifically, Mr. Burkart points to the portion of Deputy Masson’s testimony where he stated that he saw the pedestrians on the road as he approached. When asked about Mr. Novosyolova’s alcohol level of .08 on the night of the accident, Mr. Burkart stated that a blood alcohol content of .08 does not necessarily impair a pedestrian. Mr. Bur-kart stated that one of his sources for his conclusion that there was a 1.0 second reaction time in this case was a publication by Rudolf Limpert entitled “Motor Vehicle Accident Reconstruction and Cause Analysis.” Defense counsel asked Mr. Burkart about a section of that publication that stated that “[rjecent studies at the University of Dresden, Germany, have shown that driver reaction times in car-pedestrian crashes in nighttime accidents may range as high as three seconds.” Mr. Burkart replied that he disagreed with defense counsel’s suggestion that the publication could be interpreted to establish that the conditions of this accident required a 3.0 second reaction time. Mr. Burkart testified that the AASHTO Manual sets a sight distance reaction standard of 2.5 seconds for construction of intersections, but he stated that those standards are applicable to highway construction but are irrelevant to accident reconstruction principles. Mr. |!pBurkart said that if a 3.0 second reaction time is assumed and Deputy Masson’s vehicle was traveling at 40 miles per hour with properly working headlights, he would not have had a chance to do anything other than strike Mr. Novosyolova.
Oscar Franklin Griffith, an expert physicist with a specialty in accident reconstruction, testified that he worked in conjunction with Mr. Burkart in reconstructing this accident. He reviewed essentially the same documents that Mr. Burkart reviewed for this investigation. He went with Mr. Burkart to the accident scene and took measurements and made calculations related to stopping distance. He said with a 1.0 second reaction time, a driver traveling at a speed of 30 miles per hour with a headlight vision distance of 150 feet should have been able to swerve away in time to avoid the perceived danger area “much before” the point of impact in this case. Traveling at 40 miles per hour, a driver still should have been able avoid the perceived danger through a swerving maneuver. Mr. Griffith’s opinion is that Deputy Masson did not attempt an evasive swerving maneuver until the impact. He said there was a 1.0 second reaction time in this accident. Once a danger is perceived and reaction has begun, it takes another six-tenths of a second, or roughly thirty feet, to accomplish the two-foot deviation of a swerve of a vehicle to avoid the danger.
On cross-examination, Mr. Griffith stated that it takes 1.0 second for a driver to react to an unforeseen emergency. He responded negatively when defense counsel asked if data in literature on this subject, including the afore-mentioned study by Rudolf Limpert, established that a driver’s reaction time to a perceived danger is 1.5 to 3.0 seconds. Mr. Griffith said that if a roadway has proper external lighting, then headlight visibility could extend beyond 150 feet. No evidence was | npresented suggesting that the lights in Deputy Masson’s vehicle were not working properly on the night in question.
After the plaintiff rested her case, the defense called Deputy Bradley Masson back to the witness stand. He repeated his earlier testimony that he was traveling eastbound on St. Bernard Highway at ap *35 proximately 35 to 40 miles per hour. He stated that he observed something in the highway and reacted to it by immediately swerving to the left. He did not know that it was a person he struck until after the impact. After he swerved and realized he had struck something, he swerved further to his left. He then also applied the brakes to maintain control of the vehicle.
Deputy Masson said State Trooper Cro-vetto interviewed him at the hospital after the accident. When asked if he told Trooper Crovetto that he saw three people in the highway prior to the accident, his response was that he observed “something” in front of him prior to the impact. He testified that Mr. Novosyolova was wearing a dark shirt and dark pants. He said that from the time he first observed something in the highway until the impact, he never left the travel lane of the highway. He said he observed puddles of water on the right side of the white fog line near the scene of the accident.
Deputy Masson was shown videotape taken of the accident scene six months after the accident and asked if it depicted the type of lighting that was present on the night of the accident. Plaintiffs counsel objected to the use of this videotape because of the general inability to reproduce lighting conditions on videotape. The trial court ruled the tape admissible and said plaintiffs counsel’s objection went to the weight of the evidence, not the admissibility.
| ¶^Deputy Masson said that an oncoming vehicle was approaching right before the accident, but that vehicle did not affect his ability to react. He said he started the swerving maneuver before he hit Mr. No-vosyolova. At his deposition, Deputy Mas-son said he started to swerve at impact, not before or after. Also at his deposition, Deputy Masson said he saw in the distance three people walking on the highway. At trial, he said he saw three people walking and he thought at the time that all three were in the roadway and not on the shoulder. He saw one of the people take some evasive action to get out of the way. He said he did not blow his horn because he had only seconds to react after seeing something in the roadway, and he used that time to turn the steering wheel.
The last witness was Kurt Marchek, who was accepted as an expert in the field of accident reconstruction and mechanical engineering. He inspected the accident scene on April 6, 1997. In his investigation, he reviewed photographs of the accident scene, the accident report, and statements from Deputy Masson, Mr. Maxim Ryazantsew and Mr. Alexey Schtsherba-kov. He also reviewed depositions, documents from the coroner’s office, and expert reports. He also made drawings of the accident scene. At the scene, he and engineer Mark Johnson took photographs and shot a video at night as they drove down the highway in a vehicle similar to that used by Deputy Masson on the night in question. He said the lighting used in the video is more intense than the actual nighttime lighting because of the use of a flash. His opinion is that based on his investigation of the site and the videotape he took, the reaction time for a driver in those conditions is 3.0 seconds. He said a vehicle traveling 40 miles per hour would go 59 feet per second, or 177 feet in 3.0 seconds.
113Following trial, the trial court issued written reasons for judgment. In those reasons, the court stated that the primary issues in dispute were the exact location of Mr. Novosyolova when the impact occurred and whether Deputy Masson should have seen Mr. Novosyolova and avoided striking him. The court was also faced with conflicting evidence regarding lighting and reaction time. After reviewing the *36 evidence, the trial court found that an appropriate reaction time for Deputy Mas-son would be between 2.5 and 3.0 seconds for the existing nighttime lighting conditions. The court found that Deputy Mas-son saw something prior to impact and began to swerve and apply his brakes, but struck Mr. Novosyolova prior to being able to complete the maneuver.
As for the issue of where Mr. Novosyo-lova was located on the roadway at the time of impact, the trial court found that plaintiff did not prove that Mr. Novosyolo-va was to the right of the white fog line separating the travel lane from the shoulder. The court stated that the testimony of the other seamen indicated that Mr. Novosyolova was at best very near the white line, and it stated that it was particularly impressed with the testimony that another vehicle had missed them only by a half-meter only minutes before the accident.
The court concluded that this accident occurred solely due to the negligence of Mr. Novosyolova. Initially, it found that Mr. Novosyolova was in violation of La. R.S. 32:216, which requires a pedestrian to walk against the flow of traffic when no sidewalk is provided. Additionally, he narrowly avoided the same type of accident almost immediately prior to this impact and took no action to ensure his safety. And finally, the court said the plaintiffs own witnesses placed Mr. Novosyolova in the travel lane of the roadway. Specifically, the court pointed to Plaintiffs Exhibit 11, which is a recreation of where and how the three men were | uwalking, and shows Mr. Novosyolova’s upper body protruding into the roadway even though his feet are on the shoulder side of the white fog line. The court also found that Mr. Novosyolova was walking in dark clothing in' the same direction as traffic. At the speed Deputy Masson was traveling, he could not see and perceive Mr. Novosyolova until it was too late to avoid hitting him. Based on these reasons, the court found that Deputy Mas-son’s actions were reasonable under the circumstances, and he was not negligent in failing to avoid hitting Mr. Novosyolova.
It is undisputed that Mr. Novosyo-lova (and his two companions) were in violation of La. R.S. 32:216 at the time of the accident because they were walking in the same direction as the traffic in the lane closest to them. La. R.S. 32:216(B) provides as follows:
Where sidewalks are not provided, any pedestrian walking along and upon a highway shall, when practicable, walk only on the left side of the highway or its shoulder, facing traffic which may approach from the opposite direction.
Furthermore, the record supports the trial court’s determination that Mr. Novo-syolova was wearing dark clothing. Deputy Masson testified that Mr. Novosyolova’s shirt and pants were both dark colors, Mr. Ryazantsew testified that the shirt was medium blue and the pants were dark blue and Trooper McConnell stated that he thought Mr. Novosyolova was wearing light-colored clothing, but he was not positive. We additionally note that Mr. Rya-zantsew and Mr. Schtsherbakov testified that Mr. Novosyolova drank two or three cans of beer before they began walking along the highway, and the coroner certified that Mr. Novosyolova had a blood alcohol level of .08.
lisTlie trial court was presented with conflicting testimony on the issues of where Mr. Novosyolova was standing at the time of impact and what the reaction time was for a driver in the conditions presented at the time of the accident.
In Mistich v. Volkswagen of Germany, Inc., 95-0939, pp. 4-5, (La.1/29/96), 666 *37 So.2d 1073, 1077, our Supreme Court stated as follows:
It is a well settled principle that an appellate court may not set aside a trial court’s finding of fact unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly wrong. Rosell, supra at 845; Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985); Arceneaux, supra at 1333. Where the factfinder’s conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell, supra at 844. The reviewing court must always keep in mind that if a trier of fact’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990).
On the issue of where Mr. Novosyolova was standing at the time of impact, Deputy Masson testified that Mr. Novosyolova was walking in the travel lane of the roadway. Specifically, he said that Mr. Novosyolova was two to three feet inside of the travel lane when he was struck. Mr. Ryazantsew testified that Mr. l1fiNovosyolova was walking in the shoulder section of the roadway when he last saw him prior to the impact, but he admitted that he was not looking in Mr. Novosyolova’s direction when the impact occurred because he had turned to his right to say something to Mr. Schtsherba-kov. Mr. Schtsherbakov testified that Mr. Novosyolova was walking on the shoulder when he last saw him prior to the impact, but he stated that he did not look at Mr. Novosyolova for several seconds prior to the impact because he was engaged in a conversation with Mr. Ryazantsew. After the accident, the police asked Mr. Rya-zantsew and Mr. Schtsherbakov to stand where they were when the accident occurred while photographs were taken. Another man from the ship stood where Mr. Ryazantsew and Mr. Schtsherbakov said he stood when they last saw him before impact. That photograph, Plaintiffs Exhibit 11, depicts Mr. Novosyolova as having both feet to the right of the shoulder portion of the road, but showed his upper body protruding into the travel portion of the roadway.
The trial court obviously found Deputy Masson’s testimony on this issue to be credible. The trial court is entitled to great deference on its credibility determinations, and we do not find this determination to be manifestly erroneous. Given the evidence offered on this issue, we cannot say the trial court erred in finding that Mr. Novosyolova was in the travel portion of the highway when the accident occurred.
On the issue of the driver reaction time applicable in this situation, plaintiff presented the testimony of Mr. Burkart and Mr. Griffith, and the defense presented the testimony of Mr. Marchek. Mr. *38 Burkart and Mr. Griffith both testified that given the speed at which Deputy Mas-son was driving his vehicle and the lighting conditions on the highway for this nighttime accident, the reaction time that 117Peputy Masson should have perceived a danger and started evasive action was 1.0 second. Mr. Marchek testified that the reaction time for Deputy Masson on the night of the accident was 3.0 seconds. Given the agreement in the testimony that Deputy Masson was traveling at a speed of no greater than 40 miles per hour in a 45 mile per hour speed zone and that he was using his low beam headlights, the difference in the reaction times opined by the plaintiffs and defendants’ experts is critical as to the issue of whether Deputy Masson had sufficient time to take evasive action and possibly avoid striking Mr. No-vosyolova.
The plaintiff raises for the first time in her appeal brief the issue of whether La. R.S. 32:301, 321 and 322, when read in conjunction with one another, required Deputy Masson to utilize his high beam headlights at the time of the accident. La. R.S. 32:301 requires that vehicles use illuminating devices when vehicles on the highway are not clearly discernable at a distance of five hundred feet ahead. La. R.S. 32:321 provides that low beam lights are to be used to reveal persons and vehicles at least 150 feet ahead and high beam lights are to be used to reveal persons and vehicles at least 500 feet ahead. Under La. R.S. 32:322, high beam headlights are not to be used when the driver of a vehicle approaches an oncoming vehicle within 500 feet. No testimony was elicited on the specific issue of whether high beams were warranted at the time of the accident. Furthermore, Deputy Masson testified that a vehicle was approaching from the opposite direction. Given this testimony and the lack of any evidence establishing that the use of high beams was warranted, we find that the evidence presented at trial does not support plaintiffs argument that Deputy Masson’s failure to use high beam headlights at the time of the accident constituted negligence.
11sThe trial court evaluated the testimony and other evidence presented on this issue and concluded that the reaction time for this accident was 2.5 to 3.0 seconds. We find there was sufficient evidence in the record to support the trial court’s conclusion that the applicable reaction time in this accident was 2.5 to 3.0 seconds. According to the calculations offered by the expert witnesses, a reaction time of 2.5 to 3.0 seconds would not allow Deputy Mas-son enough time to avoid striking Mr. No-vosyolova.
The plaintiff argues extensively about the trial court’s admission into evidence of the videotape made by defense expert Kurt Marchek of the accident scene. Plaintiff argues that the videotape should have been excluded from evidence because it was an improperly conducted experiment or exhibition that was scientifically unreliable and prejudicial beyond any probative value. She states that it was not established that the videotape itself matched the conditions of the accident scene because the camera was calibrated at a different location than where the videotape was shot. Because defense expert Kurt Marchek stated that the videotape was a factor in his opinion that Deputy Masson faced a 3.0 second reaction time given the conditions on the night of the accident, the plaintiff argues that the trial court erred in finding that a 3.0 second reaction time applied in this case rather than the 1.0 second reaction time that Mr. Burkart and Mr. Griffith found applicable.
In Mr. Marchek’s testimony, he stated that his opinion as to the applicable reaction time was based on “the work we did at *39 the site, plus studying in detail the videotape.” Clearly, Mr. Marchek did not rely on the videotape alone in arriving at his conclusion. Furthermore, the defense offered into evidence as Defense Exhibit 3 portions of a publication written by Rudolf Limpert which included a paragraph Instating that studies have shown that driver reaction times in car-pedestrian crashes in nighttime accidents can range as high as 3.0 seconds. This same excerpt also stated that reaction times under normal condition in accident avoidance braking maneuvers range from 1 to 1.5 seconds, but that this reaction time applies to ideal daytime conditions. Both of plaintiffs experts stated that they referred to this publication in arriving at their opinions, even though they did not interpret this portion of the publication to mean that a 3.0 second reaction time applied in this case. Mr. Burkart also acknowledged that the AASHTO Manual sets a sight distance standard of 2.5 seconds in the construction of intersections, even though his opinion was that those standards are not relevant for accident reconstruction purposes. Thus, there was evidence other than the videotape in the record supporting the trial court’s determination that the driver reaction time in this nighttime accident was 2.5 to 3.0 seconds. Any error in admitting this videotape was harmless.
Additionally, the trial court was very clear in stating at trial that it was only ruling that the videotape was admissible, and the court would consider what weight to give this evidence. In Fryson v. Dupre Transport, Inc., 2000-0858, p. 4 (La.App. 4 Cir. 8/29/01), 798 So.2d 1012, 1016, writ denied, 2001-2685 (La.12/14/01), 804 So.2d 638, this Court stated as follows:
Generally, the admissibility of a videotape is within the discretion of the trial judge. Olivier v. LeJeune, 95-0053, p. 10 (La.2/28/96), 668 So.2d 347, 351; Constans v. Choctaw Transport, Inc., 97-0863, p. 33 (La.App. 4 Cir. 12/23/97), 712 So.2d 885, 901. The admissibility of a videotape is determined on a case-by-case basis depending on the individual facts and circumstances of each case. Constans, 97-0863 at 33, 712 So.2d at 901. The factors to be considered in order to determine admissibility of a videotape are as follows: (1) whether the videotape accurately depicts what it purports lanto represent, (2) whether it tends to establish a fact of the proponent’s case, and (3) whether it will aid the jury’s understanding. Ibieta v. Star Casino, Inc., 98-0314 (La.App. 4 Cir. 10/7/98), 720 So.2d 143, 147.
The decision that this videotape was admissible evidence was not an abuse of the trial court’s discretion in this bench trial. More importantly, there is no indication in the trial court’s reasons for judgment that the videotape was considered in the court’s ruling.
Based on the evidence presented as to Deputy Masson’s actions in this accident, we conclude that the trial court’s determination that Deputy Masson could not see and perceive Mr. Novosyolova until it was too late to avoid hitting him was a permissible view of the evidence. The trial court was not manifestly erroneous in finding that Deputy Masson acted reasonably under the circumstances, and was not negligent in failing to avoid hitting Mr. Novo-syolova. The court’s conclusion that'this accident was caused solely by Mr. Novo-syolova’s negligence is also not manifestly erroneous.
For the reasons stated above, we affirm the trial court’s judgment.
AFFIRMED.
McKAY, J., Dissents with Reasons.